STATE v. GARY BRUCE FOSSEN.

255 N. W. 2d 357.

March 25, 1977—No. 47121.

*Warren Spannaus*, Attorney General, *Robert W. Johnson*, County Attorney, and *Robert A. Stanich*, Assistant County Attorney, for appellant.

*Meshbesher, Singer & Spence, Ronald I. Meshbesher*, and *Carol Grant*, for respondent.

*Douglas Cann* and *David W. Larson*, for Minnesota County Attorney's Council, amicus curiae, seeking reversal.

Heard before MacLaughlin, Scott, and Stahler, JJ., and considered and decided by the court en banc.

MacLaughlin, Justice.

Defendant, Gary Bruce Fossen, is charged by indictment with three counts of murder in the first degree, Minn. St. 609.185. The State of Minnesota appeals from a pretrial order of the district court suppressing certain statements made by defendant while being held in the Anoka County jail. For the reasons stated herein, we affirm.

On February 25, 1976, the Anoka County sheriff's office received a report of a shooting in the city of Ramsey. The report was relayed to that office by the Ramsey police department dispatcher. Investigators from the Anoka County Major Crime Investigation Unit (MCIU) were dispatched to 7127 Highway 10, N. W., the scene of the crime. They were met by members of the Ramsey and Anoka City police departments, who advised them that there were three bodies in the house. The MCIU investigators walked through the house and found the bodies of one male and two females, later identified as LeRoy and Muriel Fossen, defendant's parents, and Linda Fossen Helm, defendant's sister. All three were dead from shotgun wounds.

Two separate investigators spoke with defendant at the scene as he was seated in a squad car outside the house. Without administering a Miranda warning,[1] they separately questioned defendant about his knowledge of the circumstances surrounding the shootings. Both investigators testified that their purpose in questioning defendant at this point in time was merely to gather information; they did not consider him to be a suspect.[2] The trial court found that these statements were admissible, and that finding is not challenged on appeal.

Defendant told the officers that at about 6 p.m. he had begun working on his car in a garage behind the house. Shortly thereafter he returned to the house to get a can of beer. Upon entering he discovered his father lying on the floor of the living room, covered with blood, and saw the bodies of his mother and sister lying nearby. According to defendant, his father was holding a shotgun. When defendant picked up his father, the elder Fossen purportedly said something to defendant such as "brown car" or "they're getting away in a brown car" and then slumped in defendant's arms. Defendant said that he tried to take the gun from his father's hands and it discharged into the wall. Defendant stated that he then jumped up to run outside and summon help. As he left the house, he could see the taillights of a vehicle leaving the premises. He attempted to pursue in a truck, but was unable to catch up because of traffic so he returned to the scene and summoned help.

Both investigators related that at the time they were questioning defendant he appeared dazed and upset. Defendant was taken, without objection, to the Anoka County jail, to be fingerprinted and to have his hands tested for gunshot residue. The purpose of obtaining defendant's fingerprints was to differenti-

---

[1] See, Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966).

[2] The police were initially uncertain whether they were dealing with a double murder and suicide, or a triple murder.

ate them from any others found at the scene. Prints were also taken of each of the victims.

Upon arriving at the jail, and prior to submitting to the fingerprinting and testing, defendant conferred with his attorney, Roger Nurnberger, who had been summoned by defendant's fiancee. Defendant was then released and proceeded to a local motel, where he spent the night.

Sergeant Leonard G. Christ, Jr., of the Anoka County sheriff's office was in charge of the lab work at the scene of the murders and was also present at the autopsies of the victims. It was Sergeant Christ who first discounted the murder-suicide theory, principally because it appeared that it would not have been possible for LeRoy Fossen to inflict his own wounds with the shotgun. As a result of this and other findings, and their contradiction of defendant's statements, suspicion focused on defendant and he was arrested. He was not advised of his constitutional rights at that time.

At the time of arrest, defendant's fiancee was allowed to call Attorney Nurnberger, who agreed to meet defendant at the Anoka County jail. Defendant was taken to jail and booked. Between the time of his arrest and booking, he made no statements.

After defendant was booked, but before he spoke with his attorney, he asked Investigator Richard Culton of MCIU why he had been arrested. Culton advised defendant that his arrest had been prompted by the discovery of discrepancies between his original statements and the physical evidence. Defendant then indicated a desire to speak with his attorney before he had any further discussions with the police.

Subsequently, and without any further conversation with the police, defendant was allowed to confer privately with Nurnberger. At the end of the conversation, Investigator Culton was advised by Nurnberger that defendant did not want to make any statement.

The next day Investigator Culton again spoke to defendant.

Neither Culton nor any other police officer at that time, or at any other time, delivered a Miranda warning to defendant. The ostensible purpose of Culton's interview with defendant was to obtain the information necessary to complete a pretrial release information form for bail evaluation. During this interview, defendant told Culton that he had changed attorneys and had already spoken to Kenneth Meshbesher. Culton asked if defendant and Meshbesher had discussed whether defendant would make a statement. Defendant said he had discussed that question with Meshbesher and Meshbesher had advised him not to talk to the police. However, defendant said he might still be interested in talking with Culton because he "was innocent." Culton testified that he explained to defendant that his attorney, in advising him to remain silent, was aware that any statement made by defendant might be used in court. Culton then testified, "I asked him if he understood his rights, or if they had been explained by his attorney, and he said they had." Culton administered no further warning, nor did he contact or attempt to contact defendant's counsel. Culton and defendant then proceeded to discuss the case in a conversation which lasted over 4 hours.

Later that evening Culton again sought out defendant to discuss the case. He merely reiterated to defendant by way of warning that "his lawyer was probably concerned that he might say something that could be used against him in Court." This discussion was of a much shorter duration than the first. It terminated when Culton felt that defendant was becoming "uncomfortable." The next morning Culton once more sought to discuss the case with defendant, but defendant refused to cooperate. Again, before both of these two interviews, Culton made no attempt to administer a complete Miranda warning to defendant, nor did he attempt to contact defendant's retained counsel.

■ At the omnibus hearing the trial court ruled that all of the statements made to Investigator Culton were taken in violation of defendant's constitutional rights. The trial court based the suppression of the statements made to Culton upon the failure

of the police to advise defendant of his right to have an attorney present during questioning. In the trial court's memorandum he stated, in part, as follows:

"* * * It is admitted that the Miranda warning was not given to the Defendant. The Court is of the opinion that each admonition contained in the required Miranda warning is important. Each admonition is designed to assure a defendant that he is aware of the stated constitutional rights for to be unaware of them is in effect to be deprived of them.

"The Defendant was warned that he had a right to remain silent and that anything he said may be used against him. The fact that he was not warned that he had a right to an attorney is rendered moot by the fact that he did in fact retain not one but two attorneys. The most important warning that was not given the Defendant was his right to consult with his attorney *and to have him present during interrogation.* * * *

\* \* \* \* \*

"It appears that the investigative authorities were as surprised as was this Court to find that no formal Miranda warning was given in a case involving three charges of first degree murder against a single defendant. * * *"

The importance of the right to have counsel present during interrogation was well stated by the United States Supreme Court in Miranda:

"The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowl-

edge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end. * * * Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Cf. *Escobedo v. Illinois,* 378 U. S. 478, 485, note 5 [84 S. Ct. 1758, 1762, 12 L. ed. 2d 977, 983]. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.

\* \* \* \* \*

*"Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today.* As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, *this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead.* Only through such a warning is there ascertainable assurance that the accused was aware of this right." 384 U. S. 469, 86 S. Ct. 1625, 16 L. ed. 2d 721. (Emphasis supplied.)

The state asserts first that defendant did in fact receive such a warning. In a statement prepared by Culton after obtaining the information for the pretrial release information form he stated that he asked defendant if he "fully understood his rights in respect to talking to me without an attorney present." In our judgment, this statement, if made, does not satisfy the requirement that specific notice be given to a defendant that he has a right to have counsel present during interrogation. Many persons will answer affirmatively when asked if they "know their rights" even though they may not, and Miranda requires specific and clear notice of the right to consult with and have counsel present during interrogation.

The burden of establishing that the requisite warning was administered lies with the state and must be established by a preponderance of the evidence, State ,v. Wajda, 296 Minn. 29, 206 N. W. 2d 1 (1973) ; Lego v. Twomey, 404 U. S. 477, 92 S. Ct. 619, 30 L. ed. 2d 618 (1972). The state had the burden to establish the nature and extent of the warnings given by Investigator Culton and could readily have examined him thoroughly on that precise issue while he was under oath rather than relying on his written statement. We agree with the trial court that the state failed to carry its burden of proof.

■ It is asserted, however, that even if none of the police officers adequately advised Fossen of his rights, this requirement was obviated by his consultation with counsel immediately after his arrest and before he made any statements. This contention has two fatal deficiencies. First, it is the state's burden to establish that each element of the Miranda warnings was made known to the accused, and in the instant case there is no evidence of what advice defendant's attorney gave to defendant. Although the state argues that "the conclusion is inescapable that his rights in this regard *had* been fully explained," it seems clear that the mere fact of consultation with counsel may not presumptively replace a full and effective warning as administered by the authorities. As stated in Miranda, no amount of circumstantial evidence that an accused is aware of his right to the presence of counsel will suffice to stand in the stead of a clear, unequivocal warning.

Second, even if the accused has some knowledge of his rights, the warning administered by the police has an additional importance:

"The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given.

Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, whatever the background of the person interrogated, *a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.*" Miranda v. Arizona, 384 U. S. 468, 86 S. Ct. 1625, 16 L. ed. 2d 721. (Emphasis supplied.)

Assertions as to what advice defendant's counsel gave him are no more than speculation; additionally, no such consultation can serve the purpose of insuring that the accused felt free to exercise his rights when confronted by Culton. Therefore, standing alone, the fact that defendant conferred with his counsel before he spoke with police does not establish that defendant was fully aware of the nature and extent of his constitutional rights, and the trial court properly concluded that the state had failed to meet its burden of proof in this regard.

■ The state nonetheless asserts that defendant waived his right to have counsel present. Consideration of any waiver by defendant of his right to have counsel present during questioning presupposes a valid explanation to defendant of those rights. Waiver is, by definition, the intentional relinquishment of a *known* right or privilege, Johnson v. Zerbst, 304 U. S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. ed. 1461, 1466 (1938). In the absence of a valid warning, there can logically be no voluntary and intelligent waiver.

■ Nor do we find that the statements made by defendant were volunteered, and thus not the product of a custodial interrogation. It is clear from the record that the conversations were instigated by the police, in the first instance ostensibly to obtain bail information. While we need not reach the issue because of our determination that the statements obtained are otherwise inadmissible, we note that Rule 6.02, subd. 3, Rules of Criminal Pro-

cedure, could arguably provide an independent basis for the exclusion of the statements given to Culton.[3]

■ While we rest our decision on the considerations already expressed, our opinion is buttressed by the fact that no attempt was made by any law enforcement officer to insure that defendant's counsel was notified of the interrogation and afforded the opportunity to be present. This, in spite of the fact that the police were aware that defendant had been advised to make no statement. We expressed our disapproval of the interrogation of an accused in the absence of already retained counsel in State v. Renfrew, 280 Minn. 276, 280, 159 N. W. 2d 111, 113 (1968), in which we stated:

"Even where a defendant voluntarily and intelligently waives his constitutional rights, we strongly disapprove of in-custody interrogations if defendant is represented by counsel and counsel has not had an opportunity to be present at the questioning."

We reiterate that disapproval today, in the strongest of terms. Defendant urges us to adopt a rule holding that no matter what the circumstances, the statements of an accused who has retained counsel, made in the absence of counsel, are per se inadmissible. A most complete and persuasive explication of this rule and its underlying rationale may be found in People v. Hobson, 39 N. Y. 2d 479, 384 N. Y. S. 2d 419, 348 N. E. 2d 894 (1976). Our disposition of this case makes the adoption of such a per se exclusionary rule unnecessary, but we direct attention to it so that

---

[3] Rule 6.02, subd. 3, which provides for a prerelease investigation of an accused's background in order to determine the conditions of release on bail, provides in part: "* * * Any information obtained from the defendant in response to an inquiry during the course of the [prerelease] investigation and any evidence derived from such information, shall not be used against the defendant at trial." This is an example of the manner in which our Rules of Criminal Procedure embrace the constitutional guarantees as enunciated in Miranda v. Arizona, *supra*. See, also, Rule 5.01(b).

we may underscore our disapproval of the questioning of an accused in the absence of his retained counsel.

Defendant is allowed $400 attorneys fees.

For the reasons stated herein, the order of the district court is affirmed.