**STATE of Minnesota, Respondent,**

v.

**Edward Howard REILLY, Appellant.**

**No. 46077.**

Supreme Court of Minnesota.

July 21, 1978.

C. Paul Jones, Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Gary Hansen, Sp. Asst. Atty. Gen., St. Paul, Keith Brownell, Co. Atty., Duluth, for respondent.

Heard before KELLY, TODD, WAHL and IRVINE, JJ., and considered and decided by the court en banc.

PER CURIAM.

Defendant, Edward Howard Reilly, was convicted in a jury trial of murder in the first degree in violation of Minn.St. 609.-185(2) and was sentenced to life imprisonment. On appeal, defendant contends that the district court erred in denying his motion to suppress evidence of his confession and in failing to instruct the jury on a lesser included offense. We affirm.

On October 5, 1974, Mary Mahalich was found dead in her apartment at the Woodland Hills Boys Home in Duluth. Her death was caused by strangulation, and

there was evidence of recent forced sexual penetration. Defendant had been a resident of Woodland Hills Boys Home until June 1972. The police questioned him on the morning of October 8, 1974. After informing defendant why he was being questioned and giving him a complete *Miranda* warning,[1] the police asked defendant to recount his activities on the weekend of October 5. Defendant acknowledged that he was aware of his rights and gave a detailed oral statement indicating that he had been in the Twin Cities area on the weekend in question. Upon completion of the interview, defendant was taken to the Identification Bureau where he consented to having his foot and palm prints taken. The police noticed blood on the trousers defendant was wearing, and upon request, defendant voluntarily gave them to the police.

Defendant's next contact with the police occurred the following morning, October 9, when he was brought to the police station for an unrelated matter. The police asked defendant if he would accompany two officers to the Twin Cities to investigate and confirm the story he had given the day before. Defendant agreed, whereupon he and two police officers travelled to Minneapolis. Before leaving, defendant was not given a *Miranda* warning other than a statement by one of the police officers that "[w]e did advise you of your rights yesterday." Defendant acknowledged this statement.

After investigating the details of defendant's alibi, the police were unable to confirm the story. When confronted with this information defendant could not explain the discrepancies but maintained that he was telling the truth. After returning to Duluth, the police requested a written statement from defendant concerning his activities on the weekend in question. Defendant was again reminded that he had been read his rights. The police gave defendant a statement form which contained a typed heading itemizing the *Miranda* warnings and providing a waiver of those rights. Defendant signed both the waiver

provision and the statement which he wrote himself in longhand.

Defendant also agreed to take a lie detector test. Arrangements were made, and two police officers picked defendant up at his apartment at about 8 a. m. on October 28 to take him to St. Paul for the test. While enroute, one officer gave defendant a *Miranda* warning, which he recorded. The recorded warning was as follows:

"[SERGEANT PRICE:] This is October 28th, 1974, Officers Price and Sowl accompanied by Edward Howard Reilly, and we are traveling to the St. Paul area, and the purpose of this trip is for a lie detector test to be given to Edward Howard Reilly.

"Edward, I have to read you your rights. Number one, you have the right to remain silent, you understand that? But you have to answer yes or no so I can record it.

"[THE DEFENDANT:] Yes.

"[SERGEANT PRICE:] Okay. Anything you say will be used against you in court. Do you understand that?

"[THE DEFENDANT:] Yes.

"[SERGEANT PRICE:] You have the right to talk to a lawyer and have one with you during questioning, do you understand that?

"[THE DEFENDANT:] Yes.

"[SERGEANT PRICE:] If you cannot afford a lawyer, one will be appointed to represent you before questioning if you wish one, do you understand that?

"[THE DEFENDANT:] Yes.

"[SERGEANT PRICE:] Okay. You understand that the trip is to go to the Minneapolis-St. Paul area for the purpose of a lie detector test?

"[THE DEFENDANT:] Yes.

"[SERGEANT PRICE:] And this is involving the death of Mary Mahalich?

"[THE DEFENDANT:] Yes.

"[SERGEANT PRICE:] Do you understand each of these rights I have explained to you?

"[THE DEFENDANT:] Yes.

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"[SERGEANT PRICE:] Having these rights in mind, do you still want to go to St. Paul for the test, the lie detector test?

"[THE DEFENDANT:] Yes."

Defendant was not asked any questions relative to the homicide investigation except on the return trip when the police asked him how he thought he did on the test.

As the officers approached Duluth, they were notified by police radio to bring defendant to the Detective Bureau. Upon their arrival, the officers were told that defendant had failed the lie detector test. The officers confronted the defendant with the test results and the physical evidence the police had amassed. The following recorded interrogation ensued:

"[SERGEANT PRICE:] The time is now 1515 hours on October 28th, 1974. Sergeant Price, Sergeant Sowl and Edward Howard Reilly. We are now seated in the Chief of Police's Office in the Police Department, and earlier this morning, Edward, we left Duluth to go to St. Paul-Minneapolis area for the purpose of obtaining a lie detector test, correct?

"[THE DEFENDANT:] Yes.

"[SERGEANT PRICE:] And at that time you were read your rights, correct?

"[THE DEFENDANT:] Yes, sir.

"[SERGEANT PRICE:] And you know what your rights are so we won't go over that again."

At this point defendant made an affirmative gesture which one of the officers, Sergeant Sowl, interpreted as an indication that defendant understood his rights. When asked if he cared to make any comment, defendant responded in the negative. Defendant then was arrested, and the interview was terminated approximately 14 minutes after it had begun. Defendant was left alone with Sergeant Sowl, whose recollection of the events which occurred thereafter is as follows:

"A. To the best of my recollection, we talked in generalities, not necessarily referring to the case for a few minutes, and then Sergeant Price left the room, and he went to the Chief's outer office, and I think he went down to the Detective Bureau, and probably was gone from the room about five minutes, and during this time span I felt that Reilly was about ready to tell us a story, just had a feeling that he wanted to tell us and he possibly would, so I started to question him, talking to him again, and I do recall one phrase I used, was that if there is any decency left in you, Ed, why don't you tell us, you know, what happened? The evidence as it began unraveling, and after evaluating it, it looked quite overwhelming, and I indicated to him that it appeared he would probably be found guilty of this deed, and it probably would be just as well for him to tell us what had happened.

"Q. Anything else you can recall saying to him at that time?

"A. I did mention to him that the Nuns or the Sisters up at Woodland Hills were upset about this thing, and it would be probably easier on them if he would confess to this thing, and that is about the sum and substance of any direct try on my part to get him to tell us a story, and about that time Price came back in, I don't recall if he came in just then or a minute or so later, and Ed says, 'Okay, I did it, and I will tell you about it.'"

Before taping defendant's statement, Sergeant Price made the following introduction:

"The time is now 1555 hours * * *. At this point, Edward Reilly would like to make a statement, and Edward Reilly knows his rights, they have been read to him this morning, and he understands his rights, and he feels at this time, he would like to give a statement to Sgt. Sowl and myself, Sgt. Price, both of the Duluth Police Department."

Defendant then gave a 24-minute statement admitting his involvement in Mary Mahalich's murder.

Immediately after taping defendant's statement, police took defendant to a Duluth dentist pursuant to a search warrant obtained while defendant was being interrogated and directed that impressions of defendant's teeth be taken. While enroute,

an officer gave defendant a complete *Miranda* warning. Defendant indicated that he understood his rights and wished to waive them. Upon arrival and while waiting at the dentist's office, defendant substantially repeated the taped statement he had given at police headquarters.

Between 5 and 6 p. m. that same evening, John Durfee, the Chief Public Defender for the Sixth Judicial District, learned that defendant was in custody. Because the public defender's office previously had represented defendant, Durfee and two of his assistants went to the county jail to see whether defendant wanted counsel. Upon their arrival, sometime between 6 and 7 p. m., the jailer told them that the county attorney had ordered that no one from the public defender's office could see defendant unless defendant requested counsel. At no time did defendant request counsel.

Later that evening, at approximately 8:30 p. m., defendant was given a typed transcription of the taped statement taken at 3:55 p. m. that afternoon. Defendant initialed each page and signed the last page. Just above defendant's signature was the following typed language:

"I, Edward Howard Reilly have been advised of my rights prior to giving this voluntary statement, and hereby state that this is a true and correct accounting of my activities from October 5, 1974 through October 7, 1974, to the best of my recollection at this point and time, involving the death of Mary Mahalich."

On November 14, 1974, defendant was indicted for murder in the first degree. Prior to trial, defendant moved to suppress the evidence of his confessions on the grounds that they were obtained in violation of his Fifth, Sixth, and Fourteenth Amendment rights. Following a *Rasmussen* hearing, the motion was denied. On appeal, defendant challenges that ruling and also contends that the trial court erred in failing to instruct the jury on the lesser included offense of murder in the third degree.

■ Defendant advances several arguments in support of his position that his taped oral confession was obtained in violation of his constitutional rights. The first argument concerns the timeliness of the *Miranda* warnings. Because he was not given a complete *Miranda* warning immediately prior to the interrogation which resulted in his confession, defendant argues that his confession was obtained in violation of *Miranda's* requirement that a person who is in custody and subjected to interrogation must first be informed in clear and unequivocal terms of his right to remain silent. Defendant acknowledges that he was given a complete *Miranda* warning 7 hours prior to the interrogation but contends that the officer's reference to that warning at the outset of the interrogation was inadequate in light of our decision in *State v. Fossen,* Minn., 255 N.W.2d 357 (1977).

We do not agree. Unlike *Fossen,* defendant here was given a complete *Miranda* warning the morning of the interrogation, the sufficiency of which is not challenged. For that reason, we do not feel that *Fossen* is controlling authority. More important to our decision, however, is the exchange between the police officer and defendant at the outset of the interrogation. That exchange shows that defendant specifically acknowledged the earlier warning and responded with an affirmative gesture indicating he understood his rights. Under these circumstances, we are satisfied that defendant was sufficiently informed of his *Miranda* rights. Furthermore, we do not find anything in the record that would necessitate a second complete *Miranda* warning. Defendant was in police custody all day in the company of the same officers who had given him the warning. He was aware at the outset of the purpose of the interrogation. Having fully informed defendant of his rights, the police were under no obligation to repeat a full *Miranda* warning. Under these circumstances, the reference to the earlier warning was adequate.

■ Next defendant argues that his confession was obtained in violation of *Miranda's* requirement that, once an individual "indicates in any manner that he does not wish to be interrogated, the police may not

question him." *Miranda v. Arizona,* 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707 (1966). Defendant contends that the following questions and responses establish that intent:

"[SERGEANT PRICE:] Edward, you heard what Officer Waller told you about the physical evidence, and I have explained to you about questions that were asked you down at St. Paul on the lie detector, and that they were negative, and this evidence here, the fingerprints in the car and the car being found down in Wisconsin.

"One of the questions we asked you down in St. Paul that you failed was: 'Did you throw some of Mary Mahalich's belongings out on a highway in Wisconsin?' We find some of her belongings on a highway in Wisconsin, and we find your fingerprints on the steering wheel of a car that was stolen in Duluth and abandoned down in Wisconsin, the same route that her property was found at, you know, Edward. You see what it indicates, don't you?

"[THE DEFENDANT:] Yes.

"[SERGEANT PRICE:] At this point in time, do you have anything to say relative to this?

"[THE DEFENDANT:] No.

"[SERGEANT PRICE:] You don't have anything to say."

We do not interpret defendant's response as invoking his right to silence. Rather, we think defendant's response evidenced a reluctance to answer a specific question; i. e., that he had nothing to say relative to the evidence found in Wisconsin. See, *State v. Nelson,* Minn., 257 N.W.2d 356 (1977). Had defendant desired to terminate the interrogation he could have said so rather than answer more questions. Under these circumstances, defendant's confession was not obtained in violation of his right to terminate the interrogation.

■ Defendant's final argument contesting the admissibility of his taped oral confession is based on the doctrine of waiver: Defendant argues that he did not knowingly, intelligently, and voluntarily waive his right to remain silent. This contention is based on the following circumstances surrounding his confession: (1) He was not apprised specifically of his *Miranda* rights immediately prior to his interrogation; (2) the interrogation was continued after defendant stated he had nothing further to say; and (3) the form of police questioning was coercive. In determining the voluntariness of a confession, we must examine the totality of the circumstances. See, *State v. Biron,* 266 Minn. 272, 123 N.W.2d 392 (1963). Neither defendant nor the record suggest that the police used trickery, deceit, or physical force in attempting to obtain defendant's confession. See, *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). The totality of circumstances indicates that defendant's confession was not obtained involuntarily.

■ Defendant also argues that his signed confession, which was a typed transcription of his taped oral confession, was obtained in violation of his right to counsel as established in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Defendant's argument is premised on the refusal of the police and the county attorney to permit the public defender to speak with defendant prior to his signing the confession. We think defendant's reliance on *Escobedo* is misplaced.

In *Escobedo,* the Court stated that where "the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment * * *." 378 U.S. 491, 84 S.Ct. 1765, 12 L.Ed.2d 986. Here defendant does not contend that he requested counsel. Further, defendant was advised not only of his right to remain silent but also of his right to an attorney, including an appointed attorney if he could not afford one. See, e. g., *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (defendant advised of right to remain silent; defendant's statement about seeing an attorney was neither as clear nor as

unambiguous as request in *Escobedo*). Absent a request for an attorney, the challenged conduct did not deny defendant his Sixth Amendment right to counsel.

■ Defendant attempts to obviate the need for a request for counsel by arguing that, for all practical purposes, defendant "retained" the public defender, since the public defender had represented defendant previously, knew defendant to be indigent, and could reasonably assume that the public defender's office would be representing defendant. The statute authorizing preappearance representation, however, does not support defendant's contention. Minn.St. 611.18 provides in part:

" * * * [P]rior to any court appearance, a public defender may represent a person accused of violating the law, who appears to be financially unable to obtain counsel, and shall continue to represent such person unless it is subsequently determined that such person is financially able to obtain counsel. Such representation may be made available at the discretion of the public defender, *upon the request of such person or someone on his behalf* * * *." (Italics supplied.)[2]

The statute clearly requires not only apparent indigency but also a request for counsel on the part of a defendant. The public defender, like private counsel, cannot be "retained" absent a request. For the same reason, defendant's reliance on Minn.St. 481.10, which requires persons restraining an individual to admit any attorney "retained by or in behalf of the person restrained, or whom he may desire to consult," is misplaced. Defendant's signed confession was properly admitted into evidence.

■ Finally, defendant argues that the trial court erred in declining to instruct the jury on murder in the third degree under Minn.St. 609.195(1), which reads in pertinent part as follows:

"Whoever, without intent to effect the death of any person, causes the death of another by * * * the following means, is guilty of murder in the third degree * * * :

"(1) Perpetrates an act eminently dangerous to others and evincing a depraved mind, regardless of human life * * *."

The trial court denied the requested instruction because of the statutory language, "[p]erpetrates an act eminently dangerous to *others*." (Italics supplied.) Defendant interpreted the basis of the trial court's refusal as requiring that the eminently dangerous act must threaten more than one person. We think defendant misinterprets the basis for the trial court's refusal.

We have consistently construed the statute governing murder in the third degree as intended "to cover cases where the reckless, mischievous, or wanton acts of the accused were committed without special regard to their effect on any particular person or persons, but were committed with a reckless disregard of whether they injured one person or another." *State v. Lowe,* 66 Minn. 296, 298, 68 N.W. 1094, 1095 (1896).

Defendant argues that *State v. Leinweber,* 303 Minn. 414, 228 N.W. 120 (1975), changed the accepted interpretation of the statute to include situations where the "eminently dangerous act" threatens only one person. With this we cannot agree. In *Leinweber,* the "eminently dangerous act," i. e., the dislodging of jammed shells from a gun, was dangerous to anyone "who happened to come along, or be in the way, at the time of the act or omission." *State v. Lowe,* 66 Minn. 296, 299, 68 N.W. 1094, 1095. The "eminently dangerous act" here was defendant's sexual assault of the victim, which requires specific intent and is directed particularly at the victim. In the words of *Lowe,* defendant's act was not one "committed without special design upon the particular person * * * with whose murder the accused is charged." *Ibid.* In

2. See, also, Minn.St. 611.07, authorizing appointment of counsel *upon request* of the indigent defendant. Rule 5, Rules of Criminal Procedure became effective July 1, 1975, after the date of the commission of this crime, and presently spells out in great detail the concept of § 611.07.

this case, the trial court did not abuse its discretion in refusing to submit to the jury murder in the third degree.

Defendant's conviction is affirmed.