**STATE of Minnesota, Respondent,**

v.

**Charles Wesley ANDREWS, Appellant.**

No. C0–85–146.

Supreme Court of Minnesota.

June 6, 1986.

---

C. Paul Jones, State Public Defender, Heidi H. Crissey, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Co. Atty., Darrell C. Hill, Asst. Co. Atty., St. Paul, for respondent.

WAHL, Justice.

Charles Wesley Andrews was convicted of the first degree murder of Denise Alford and sentenced to the mandatory term of life imprisonment. He appeals from this judgment of conviction, claiming the evidence is insufficient to prove that he killed Alford intentionally or with premeditation. Andrews also claims the trial court erred in failing to suppress statements he made to the police and that he did not receive a fair trial because the trial court refused to permit sequestered voir dire of prospective jurors. We affirm the conviction.

On August 7, 1984, Denise Alford bled to death from a stab wound in the back. Charles Andrews admits he was involved in the incident that led to her death, but maintains Alford was stabbed by accident, not intentionally or with premeditation.

Denise Alford, also known as "Nisi," was 31 years old and had lived in the Twin Cities for three months before her death. She moved here in May 1984 from Detroit, Michigan with her younger brother, Gregory, to take a job at the Ford Motor Company plant in St. Paul. Alford had two children, ages 9 and 15, who were living temporarily with her parents in Detroit. Charles Andrews was an old friend of Alford's. They had met in Detroit in 1981 and began a romantic relationship in 1982. Andrews had lived with Alford and her children in the Detroit area on and off during 1982–83. After Andrews left Alford's Detroit home in November 1983, the couple had continued to have some sort of relationship. In late July, Andrews came from Detroit to the Twin Cities to visit Alford. He testified he intended to stay only a few days. When he arrived, Alford and her brother were in the process of moving into a house they had rented in St. Paul. Andrews helped the Alfords move and stayed at the house with them during the rest of his visit.

During Andrews' visit, old conflicts recurred in his relationship with Alford. On several occasions, the couple fought because, Andrews testified, Alford was jealous of his past relationship with another woman. Alford feared, he said, that he was still seeing this woman in Detroit and that he was the father of this woman's children. He claimed they reconciled these conflicts, however, and said that Alford had persuaded him to change his plans and

to find work in the area. Andrews accepted a temporary 3-week job with a home insulation company and was to report for work at 6:30 a.m. on August 7.

On Monday, August 6, Alford worked her scheduled shift at the Ford plant, leaving for work in the evening about 5:00 p.m. Andrews stayed home with Gregory Alford, listening to records. He went to bed early in the upstairs bedroom about 8:30 or 9:00 p.m. and Gregory stayed downstairs, listening to records and dozing on the living room couch. About midnight, Gregory awoke hungry. He went upstairs, woke Andrews and asked to borrow money and his car. Gregory went to the store, purchased food, and returned home about 12:30 a.m., replacing Andrews' keys on the bedroom dresser. Gregory went back downstairs, ate hamburgers, and watched television until he again fell asleep on the couch, about 2:30–3:00 a.m.

At this point, the version of events offered by Andrews and Gregory Alford, the state's key witness, diverge. Gregory testified he awoke four more times that night as he slept on the downstairs couch. He was first roused when his sister came home from work. A Ford personnel officer testified Denise Alford worked a normal shift on August 6–7 and would have left the plant to return home about 4:00 a.m. Gregory saw Denise go upstairs, but he didn't speak to her. He awoke a second time, hearing voices upstairs, which, he said, sounded like his sister and Andrews were "exchanging words." He woke up a third time and saw, by the light of the television, that Andrews was downstairs in the living room, walking from the kitchen and heading back upstairs.

Gregory fell asleep again and was roused a final time by his sister's voice. He heard her scream, say "Oh, Charles, No, No," then he heard a lot of "ahhs" and a choking sound. Gregory jumped off the sofa and met Andrews coming down the stairs. He confronted the man, demanding to know what he had done and saying he had heard something. Andrews said he had done nothing and headed for the back door.

Gregory stopped Andrews again near the back door, saying, "You wait. You go back upstairs with me and let's see what you have done." Again, Andrews denied having done anything. Gregory testified that he felt confused at that point because Andrews didn't appear to be acting as if anything was wrong. Gregory tried to block the back door and then, he testified, Andrews grabbed him by the shoulders and threw him down the basement stairway. His shoulder broke a stair as he tumbled to the bottom. Gregory said he was unconscious for an unknown period, but long enough for Andrews to have left in his car by the time Gregory roused himself.

Gregory went upstairs and found his sister dead. She was sitting on the bathroom floor, in the corner made by the bathtub and the wall, in a pool of blood. He pulled her head forward and saw a knife "all the way in" her back. Some of Andrews' clothing was lying in the bathtub and under the woman's legs. Gregory called for the police and an ambulance.

Andrews testified that after he went to bed that evening, he was awakened once by Gregory and was shaken awake again by Denise Alford when she returned from work. Andrews said she told him at that time to leave and he agreed, thinking that it was best he return to his life in Detroit. Andrews said he got up, dressed, and gathered a bundle of work clothes for the insulating job. As he prepared to leave, Alford angrily asked him if was going to return to his other woman, but then, he said, she changed her mind and asked him to stay. Andrews said he went into the bathroom to brush his teeth and comb his hair, but continued to talk to Alford through the half-closed bathroom door. She talked some more about this other woman, he said, and then told him he thought he was smart. As he answered her, Andrews testified, Alford suddenly rushed into the bathroom. She had a knife, Andrews said, and he wrestled with her, grabbing her hands. Then he lost his footing and the two fell into the bathtub, with him on top. Andrews said he got up and looked at

Alford, whom he described as lying in the bathtub with her legs hanging over the edge. She said, "Charles, I think I am hurt." Andrews said he saw no blood, nor the knife, but that he was afraid to help her, fearing she would come at him again with the knife. Instead, Andrews said, he went downstairs to call for help. As he went down the stairs, he was grabbed by Gregory Alford who blocked his way and struggled with him. Andrews said he felt very emotional and was afraid Gregory wanted to fight him so he decided to leave the house to get help. He pulled open the back door, which Gregory was blocking, and Gregory fell down the basement steps. Andrews said he took his car and drove off. He stopped at a service station and made a collect long-distance telephone call to his sister in Detroit. He told his sister that he had wrestled with a knife with Alford, that he didn't know if she had been injured, and that he was on his way to the police station.

The police arrived at the Alford house in response to Gregory's call at about 5:30 a.m. In addition to the body and the murder weapon, police found a second knife on the upstairs bedroom dresser and piles of Andrews' clothing on the floor in the bathroom and in the kitchen. In the kitchen, a drawer containing knives and silverware was standing open.

Andrews walked into the St. Paul Police Department at about 6:00 a.m. The officer assigned to the desk testified at trial that he immediately noticed Andrews because the man walked hesitantly and appeared distraught. Andrews said, the officer testified, "I think I just killed my girlfriend." Andrews was taken into custody and twice during that day, was interrogated by police. Andrews told police his version of events and when asked why he had come to the police station, answered "I did something wrong * * * I hit Nisi with the knife." In recounting what had happened, Andrews at one point said he had wrestled

the knife away from Alford; at another point, he said she was holding it when they fell into the bathtub. When asked if he had stabbed Denise Alford, Andrews said, "No, I didn't stab her," and later he said "I don't know if I stabbed her or not. I don't know."

This appeal raises the following issues:

1) Whether the evidence was sufficient that the defendant killed Alford intentionally and with premeditation;

2) Whether the trial court erred in failing to suppress the defendant's statements to the police, in violation of his Fifth and Fourteenth amendment privilege against self-incrimination; and

3) Whether the trial court abused its discretion, thereby denying the defendant a fair trial, by refusing to allow sequestered voir dire of prospective jurors where it was alleged there was a possibility that prospective jurors had been exposed to prejudicial pre-trial publicity.

I.

Andrews challenges the sufficiency of the evidence to support a conviction of first degree murder, though he admits he was involved in the incident that led to Alford's death. He argues the State did not prove beyond a reasonable doubt that Alford's death was intentional or premeditated.[1] Rather, Andrews claims she was killed accidentally when the couple fell into the bathtub while struggling over the knife Alford held in her hand.

All elements of first degree murder, including intent and premeditation, must be proved beyond a reasonable doubt. *State v. Martin,* 293 N.W.2d 54, 55 (Minn. 1980). "Intent" is present where the actor either has a purpose to do the thing or to cause the result specified, or believes that his or her act, if successful, will cause that result. Minn.Stat. § 609.02, subd. 9(4) (1984). "Premeditation" means to consider, plan or prepare for, or determine to

---

1. Andrews was convicted under Minn.Stat. § 609.185(1) (1984): "Whoever * * * [c]auses the death of a human being with premeditation

and with intent to effect the death of the person or of another * * * is guilty of murder in the first degree."

commit, the act referred to prior to its commission. Minn.Stat. § 609.18 (1984). Because intent and premeditation are states of mind, they are generally proved only by inferences drawn from a person's words or actions in light of all the surrounding circumstances. *State v. Kirch*, 322 N.W.2d 770, 773 (Minn.1982).

The testimony of Andrews and of Gregory Alford, and the physical evidence at the scene, all indicate Andrews stabbed Alford intentionally and not inadvertently, and that he premeditated the incident that led to her death. Gregory Alford testified that he heard what sounded like Andrews and his sister arguing soon after she came home from work at about 4:30 a.m. A short while later, Gregory testified, he awakened and saw Andrews downstairs, coming from the kitchen. The next time he was awakened, he heard his sister scream and say, "Oh, Charles, no, no," then he heard sounds of physical distress. Two knives were later found upstairs, one in Alford's body, and one on top of the dresser in the bedroom where Andrews had been sleeping. Gregory Alford testified that when he returned Andrews' car keys to the dresser several hours before the murder, he had not seen a knife there. In the kitchen, the drawer containing knives had been left open.

■ From this evidence, the jury could have inferred that after arguing with Alford, Andrews came downstairs, procured knives from the kitchen, went back upstairs, struggled with Alford and then stabbed her. Premeditation does not require proof of extensive planning or preparation to kill. *State v. Lemire*, 315 N.W.2d 606, 610 (Minn.1982). The requisite plan can be formulated virtually instantaneously. *State v. Neumann*, 262 N.W.2d 426, 430 (Minn.1978). We have held that procuring a weapon from another location in the house and walking down a hallway to kill one's victim indicates premeditation. *Bangert v. State*, 282 N.W.2d 540, 544 (Minn.1979). Even though Andrews denied he came downstairs after he went to bed that evening, his testimony was contradicted by that of Gregory Alford who had seen him downstairs. On review, "[w]e must view the evidence in the light most favorable to the State and must assume that the jury believed the State's witnesses and disbelieved everything which contradicted their testimony." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980); *See also, State v. Engholm*, 290 N.W.2d 780, 784 (Minn.1980).

The physical evidence obtained from the expert's examination of Alford's body also cannot be reconciled with Andrews' claim that she was accidentally stabbed. The medical examiner's expert testimony was that Alford was stabbed once, with sufficient force to bend the knife blade and cut into a rib bone. His expert opinion was that the parallel track of the knife wound and the force with which the knife entered the body was inconsistent with the claim that Alford accidentally fell on the knife, even in a struggle. There was some indication, he further stated, that the knife was repeatedly thrust in the wound and he commented on the fact that neither the defendant nor the victim had other defensive wounds, as might be expected after a fierce struggle over the knife such as Andrews described.

■ The jury also could have inferred intent and premeditation from Andrews' actions after Alford was stabbed. Events both before and after a death are relevant to the totality of the circumstances from which inferences of intent and premeditation may be drawn. *Kirch*, 322 N.W.2d at 773–74; *State v. Hardimon*, 310 N.W.2d 564 (Minn.1981). Despite Andrews' claim that he thought Alford was only injured and that he left the house to seek help for her, Gregory Alford's testimony about his confrontation with Andrews at the house seems to indicate Andrews was only concerned with escaping. After leaving the house, Andrews' own testimony about his actions indicates he was aware of the magnitude of what he had done. Rather than seek medical help for Alford, Andrews telephoned his sister and then surrendered to police, telling the officer at the front desk,

"I think I just killed my girlfriend." In interrogations later that day, he told police that he had done something wrong and had "hit" Denise with the knife after wrestling it away from her.

 Proof of intent and premeditation in this case is circumstantial. We will uphold a conviction based on circumstantial evidence if the reasonable inferences to be drawn from this circumstantial evidence are inconsistent with any rational hypothesis other than the hypothesis accepted by the jury. *State v. Threinen,* 328 N.W.2d 154, 156 (Minn.1983). Our examination of the evidence demonstrates that Andrews' alternative explanation of the circumstances of Alford's death cannot be reconciled with the evidence. The inferences drawn by the jury, leading them to convict, form the only rational hypothesis to be drawn from the evidence in the case. We therefore hold the evidence is sufficient as a matter of law to support the jury's conclusion that the killing of Denise Alford by Charles Andrews was intentional and premeditated.

## II.

Andrews next contends the trial court erred in allowing into evidence inculpatory statements he made to the police during interrogation. He claims this confession was not made voluntarily, that he did not receive proper *Miranda* warnings before being interrogated on one occasion, and that he did not have the capacity to knowingly and intelligently waive his rights when interrogated on another occasion. Andrews claims these deficiencies rendered his inculpatory statements inadmissable at trial and he contends the trial court's failure to suppress them violated his privilege against self-incrimination as contained in the Fifth and Fourteenth amendments of the United States Constitution.

The trial record contains detailed testimony about the circumstances of Andrews' interrogation by the police. He was taken into custody at approximately 6:00 a.m. on the day of the murder when he walked into the police station and turned himself in.

At approximately 8:00 a.m., Andrews was questioned for the first time by Sergeant Bruce Wynkoop of the St. Paul Police Department. Wynkoop stated that when he first entered the interview room, Andrews was upset and crying, so Wynkoop left him alone for about five minutes to compose himself. Wynkoop then returned and asked if Andrews felt like he could talk and, according to Wynkoop, Andrews said yes. Wynkoop then advised Andrews of his *Miranda* rights. He read each right out loud, asked Andrews to read along on a printed form provided, asked him if he understood each right, and had him initial the form to acknowledge each right. When he concluded the advisory, Wynkoop asked Andrews to sign the printed form. Andrews tried to sign, but faltered twice. On the third attempt, he signed a shaky version of his signature. During the advisory process, Wynkoop testified, Andrews asked no questions and continued to cry, although he appeared to the officer to understand what was going on.

Wynkoop then asked Andrews if he wanted to talk about what happened and Andrews said he did. In response to a question, Andrews said, "Yeah, we were fighting," but Wynkoop stated Andrews was thereafter unable to say more because he began crying and became very upset, saying repetitively, "I love her, I love her, I love Nisi." Wynkoop said, "He stared at his hands and he didn't look at me and he didn't appear to be able or want to go on talking." Wynkoop decided to end the interview and took Andrews back to the jail and booked him for homicide. This first interview lasted about 20 minutes.

That afternoon, between 2:00–3:00 p.m., Sgt. Wynkoop again questioned Andrews. Wynkoop testified that Andrews said he felt better and he appeared able to communicate. Before questioning him, Wynkoop did not repeat or refer to the earlier *Miranda* advisory. Andrews then told his version of events. The questioning lasted about 40–60 minutes. Wynkoop testified that occasionally during this second interview, Andrews would cry or stop talking.

"[T]hen," Wynkoop said, "I would just wait and he would blow his nose and then we would continue the interview." Otherwise, it appeared to Wynkoop that Andrews understood what was going on.

In this appeal, Andrews does not allege that the police failed to advise him of his *Miranda* rights before the morning interview or that the police acted improperly in coercing a statement from him. His contention is that he was so distraught at the time of the morning interview that he was incapable of comprehending his rights as they were read to him, or of effectively waiving those rights, or of making a voluntary and rational choice to make inculpatory statements to the police. He further claims the state did not meet its burden of proving he had received the required *Miranda* warning when he was questioned at a second afternoon interview.

Statements made by an accused during custodial interrogation may be admitted at trial only if he or she was properly informed of constitutional rights, has knowingly and intelligently waived the privilege against self-incrimination, and has made the statements freely and voluntarily. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966) (warning and waiver); *Haynes v. Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1342, 10 L.Ed.2d 513 (1963) (voluntariness); *State v. Merrill*, 274 N.W.2d 99, 106 (Minn.1978) (*citing Miranda* and *Haynes* standards).

The state bears the burden of proving the *Miranda* warning was given. Where there is evidence the warnings were given and that the defendant understood those rights and gave a statement, the state is deemed to have met its burden of proving the statements are admissible, unless there is other evidence indicating the statement was not voluntary or that the alleged waiver of rights was not effective. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978).

The voluntariness of a confession is a separate issue and must also be shown by a preponderance of the evidence. *State v. Wajda*, 296 Minn. 29, 31–32, 206 N.W.2d 1, 2–3 (1973). An incriminating statement made to police has been shown to have been made voluntarily if the totality of the circumstances indicate the statement was a product of a free-will decision. *State v. Orscanin*, 283 N.W.2d 897, 899 (Minn.1979), *cert. denied* 444 U.S. 970, 100 S.Ct. 464, 62 L.Ed.2d 385 (1979).

Andrews does not dispute that he was advised of his *Miranda* rights before the morning interview and that he acknowledged receiving those rights by initialing and later signing a printed form. When he was asked if he wanted to talk, Andrews answered yes, and thereafter told police that he had fought with the victim. There was police testimony that Andrews was emotionally distressed and crying at the morning interview, but police also observed that he appeared to be able to understand what was said to him and that he asked no questions. Police also testified, however, that soon after being advised of his rights and stating that he had fought with Alford, Andrews broke down and his distress overwhelmed him. In *State v. Brown*, 345 N.W.2d 233 (Minn.1984), we emphasized the importance of allowing an emotionally upset defendant time to become composed before making a confession. This, we stated, will ensure that the statement is "the product of an essentially free and voluntary choice." *Id.* at 238. Upon observing that Andrews could no longer understand or answer questions, the police properly terminated this first interview.

The real issue presented here, however, is not how the police handled Andrews' distress, but whether Andrews' mental and emotional state impaired his ability to comprehend his constitutional rights as they were read to him, to intelligently and knowingly waive those rights, and to freely and voluntarily choose to make inculpatory statements to the police. In *State v. Hoffman*, 328 N.W.2d 709, 714 (Minn.1982), we found a defendant who was described by police officers as coherent and responsive, but who broke down four or five times

during questioning, to have been capable of making a voluntary confession. *Id.* We reached this conclusion after an independent review of the record, which included evidence that the defendant had been diagnosed as a delusional psychotic, and that psychiatrists had given conflicting opinions of his capacity to understand the *Miranda* advisory on the day he confessed. There was also evidence that at his Omnibus Hearing, the defendant testified he could only partially remember the police interrogation, although he recalled confessing to murder and knew that he had wanted to confess. The police had also testified that the defendant appeared to understand what was going on and to respond, even though he made some inappropriate remarks, *Id.* at 713–715. The effect of Andrews' mental condition on his capacity to comprehend and waive his rights, or to voluntarily offer incriminating statements, cannot be meaningfully distinguished from that of the defendant in *Hoffman.* It is true that Andrews was deeply upset during the morning interview. His trial testimony was that he remembered very little about that interview. The police also observed that he was extremely upset and crying. The police also testified, however, that despite this distress, Andrews was coherent and responsive while being advised of his *Miranda* rights and when he told police he had fought with Alford. Only after this critical point did he break down.

■■■ Our review of the record indicates that the state established by a preponderance of the evidence that Andrews was capable of understanding and of knowingly and intelligently waiving his *Miranda* rights in the morning interview, and that he was capable of making a free and rational choice to voluntarily offer inculpatory statements to the police. This determination, however, does not fully answer Andrews' challenges to the admissibility of statements made in a second interrogation when police again questioned Andrews. Before the afternoon interview, the police neither re-read the *Miranda* warning nor referred to the previous warning. During the afternoon questioning, Andrews made more extensive incriminating statements about the incident that led to Alford's death. Andrews claims the *Miranda* warning given him that morning did not cover this second interrogation.

We rejected a similar challenge in *State v. Reilly,* 269 N.W.2d 343 (Minn.1978). There we held that where a defendant received a complete *Miranda* warning before a first questioning, and was questioned again seven hours later without being rewarned, the earlier warning was constitutionally adequate to cover statements made in the later interview. We observed that Reilly was in police custody all day in the company of the same officers who had given him the warning, that he was aware at the outset of the second round of questioning of the purpose of the interrogation, and that before the questioning began, he acknowledged the earlier warning and responded with an affirmative gesture indicating he understood his rights. *Id.* at 347. Given the totality of the circumstances of the case, we concluded in *Reilly* that a repetition of the warning was not necessary to ensure the defendant knew of his rights. *Id.*

The issue in *Reilly,* as it is here, was whether the lack of a second warning left the defendant unaware of the meaning or seriousness of the second interrogation, and whether his decision to confess at that time was thereby rendered involuntary by his lack of awareness. Voluntariness is determined by the totality of the circumstances. Andrews was questioned both times by the same police officer in the same interview room. Further, the *Miranda* advisory he had received earlier in the day was careful and comprehensive. Even though no reference was made to the earlier *Miranda* warning before the second interrogation began, this fact alone does not render Andrews' confession involuntary. There are factors present in Andrews' case which, taken as a whole, indicate he was fully aware of his rights and conscious of his position in the afternoon interview. Andrews had surrendered to the police immediately after the murder,

indicating he knew of the seriousness of his position. Further, he testified at trial that it was his own decision to tell his version of the incident to the police in the afternoon interview. Under all these circumstances, the earlier *Miranda* advisory was adequate to cover the afternoon interview.

We conclude that Andrews was given timely and constitutionally adequate *Miranda* warnings and that he could and did knowingly and intelligently waive those rights when he chose to make incriminating statements to the police. Further, we conclude that under the totality of circumstances, Andrews voluntarily confessed. We therefore hold the trial court did not err in admitting his confession into evidence.

### III.

Andrews' final claim is that he was denied a fair trial by an impartial jury by the trial court's refusal to sequester prospective jurors during voir dire. Before jury selection began, defense counsel moved for sequestered voir dire of prospective jurors, stating that newspaper reports had been published highlighting the tragic coincidence that Denise Alford's children were flying from Detroit to join their mother in St. Paul on the morning of her death and were met at the airport with the news of her murder. The defense feared exposure to these reports would prejudice prospective jurors. The trial court denied the request on the basis that there had not, in fact, been extensive pre-trial coverage of the case. In the nonsequestered voir dire, defense counsel was not restricted in questioning prospective jurors about their exposure to prejudicial publicity.

The Minnesota Rules of Criminal Procedure mandate sequestered voir dire "[w]henever there is a significant possibility that individual jurors will be ineligible to serve because of exposure to prejudicial material * * *." Minn.R.Crim.P. 26.02, subd. 4(2)(b). Where no such "significant possibility" of exposure exists, sequestration is at the trial court's discretion. Minn. R.Crim.P. 26.02, subd. 4(2)(a). Andrews did not allege that the frequency of media reports about Denise Alford's children cre-

ated a "significant possibility" that prospective jurors would have been exposed, which would have mandated sequestration under the Rule 26.02, subd. 4(2)(b). In fact, when defense counsel argued for sequestration, counsel conceded "there wasn't extensive pre-trial publicity in this matter."

Absent a "significant possibility" of exposure, the issue becomes whether the trial court's refusal to permit sequestered voir dire was an abuse of discretion under Rule 26.02, subd. 4(2)(a). This record, which reflects that the trial court did not restrict defense counsel's questioning of prospective jurors about exposure to publicity in the nonsequestered voir dire, shows no abuse of discretion by the trial court. We hold Andrews was not deprived of a fair trial by the trial court's denial of his motion for sequestered voir dire of prospective jurors.

Finding no basis to rule otherwise, we affirm on all grounds the defendant's conviction of first degree murder in violation of Minn.Stat. § 609.185, subd. 1 (1984).

Affirmed.