**STATE of Missouri, Respondent,**

v.

**Richard CHANDLER, Appellant.**

**No. 61555.**

Supreme Court of Missouri,
En Banc.

Sept. 9, 1980.

Hale W. Brown, Kirkwood, for appellant.

John Ashcroft, Atty. Gen., Michael A. Scearce, Asst. Atty. Gen., Jefferson City, for respondent.

PER CURIAM.

Appellant was convicted of capital murder, a violation of § 559.005, RSMo Supp. 1975, and sentenced to life imprisonment. Appellant assigns error in the admission into evidence of his videotaped confession and grand jury testimony, alleging a violation of his sixth amendment right to counsel. Jurisdiction is in this Court because the punishment imposed was imprisonment for life. Mo.Const. art. V, § 3. We affirm.

On August 2, 1976, at about nine o'clock in the evening, three men entered the law office of Joseph Langworthy at 103 E. St. Louis Avenue in the City of Pacific, Franklin County, Missouri. The three men spoke with Mr. Langworthy a short time and left. Fifteen to twenty minutes before ten o'clock that evening, Mr. Langworthy telephoned Mrs. Katherine Finder and described how busy the evening had been. He told Mrs. Finder that his secretary was ready to go home, and stopped the conversation long enough to tell her goodbye. A short time later he interrupted the conversation to say there was someone at the door, and told Mrs. Finder to wait. Mrs. Finder could hear the sound of voices, but could not hear what was said when Langworthy was away from the phone. After a while she heard him say "Please, man, don't hurt me. Oh, my God." Almost immediately she heard a noise that sounded like a deep sigh. She waited for a short time, but she heard nothing. Mrs. Finder called Mr. Langworthy's secretary, Helen Brauer, and told her to call the police, that someone had broken into Mr. Langworthy's office. Mrs. Brauer alerted the Pacific police, then dressed and drove to Mr. Langworthy's office. She spoke to police, then walked up the stairs to the office, and saw the body of Joseph Langworthy on the floor behind his desk lying in a pool of blood.

An autopsy was performed on Langworthy's body on the morning of August 3, 1976. The autopsy revealed an abdominal wound just over the waist and to the left of the centerline. The abdominal wound was a vertical stab with about a three inch lateral extension in a crescent shape, cut slightly downward to the right. The index finger of the left hand had been cut with a sharp instrument. There was a slash wound on the left side of the neck, extending from slightly to the right of the midline to the corner of the jaw, approximately four inches long and a maximum of two inches deep. The strap muscles were severed, as was the carotid artery and the jugular vein on the left side of the neck. About three–fourths of the circumference of the larynx was cut through above the

vocal cords. The lungs were found to contain about a pint of blood. The pathologist determined that the cause of death was massive blood loss.

On June 14, 1978, while being held on burglary charges in Lonoke, Arkansas, appellant's brother, Michael Chandler, gave a statement which implicated appellant in the murder of Joseph Langworthy to Michael Scott, Chief Investigator of the Franklin County Prosecutor's Office; Daryl Hartley, Assistant Prosecuting Attorney of Franklin County; and Sergeant Robert North, an officer in the Intelligence and Investigation Division of the Missouri State Highway Patrol. In June of 1978, appellant was visiting his sister–in–law in Cascade, Oregon. On June 21 or June 22, 1978, Chief Investigator Scott and Sergeant North, along with Oregon State Highway Patrolmen, visited the home of appellant's sister–in–law. Appellant was arrested on a charge of possessing an unregistered sawed–off shotgun. A federal grand jury subsequently indicted appellant for an alleged violation of the Federal Firearms Act. On June 22, 1978, appellant was charged with first degree murder in the Magistrate Court of Franklin County, Missouri. Appellant waived extradition and was transported to the Franklin County Jail. On August 23, 1978, an indictment was filed in the Circuit Court of Franklin County, Missouri, charging appellant with capital murder. On September 5, 1978, appellant was arraigned on the charge of capital murder in the Circuit Court of Franklin County, and informed of the range of punishment. Appellant appeared with his counsel, James L. Anding, and entered a plea of not guilty. Appellant's request that the court set bail was taken under advisement.

While appellant was held in the Franklin County Jail, he sent messages to Michael Scott twelve to fifteen times, usually through Deputy Sheriff Ron Rogers. Between the time appellant returned from Oregon and September 25, 1978, Michael Scott met with appellant several times apparently without notice to appellant's attorney Anding or with his prior knowledge.

The only time that Scott talked with appellant in the Franklin County Jail, however, was when appellant himself asked to speak to Scott. Appellant did not make any statement incriminating himself in the murder of Joseph Langworthy prior to September 26, 1978.

On September 25, 1978, appellant was taken to the United States Marshal's Office in St. Louis, Missouri, for arraignment on the federal indictment. Appellant was processed on the federal charge by Edwin Kuster of the United States Bureau of Alcohol, Tobacco and Firearms. Mr. Kuster advised appellant of his rights, as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thereupon, appellant asked to talk to Mr. Kuster concerning a homicide in Franklin County, Missouri, and asked whether it would be possible to make a deal. Appellant asked Mr. Kuster whether the federal charge would be dropped if appellant became a state's witness in Franklin County. Mr. Kuster told appellant that it was not within his authority to make a deal, but that he could put him in touch with people who could. Appellant then asked to speak to the Franklin County authorities on the telephone. Mr. Kuster telephoned Michael Scott in Franklin County and let appellant talk to him. Appellant told Scott that he wanted to see him. After receiving the call, Michael Scott telephoned Sergeant Robert North and both men went to the United States Marshal's Office in St. Louis, Missouri to talk with appellant. Appellant told Scott and North that he would like to talk about making a deal concerning the murder in Pacific, Missouri. Michael Scott testified that he told appellant "We cannot talk to you, you are represented by counsel." Mr. Kuster testified that he informed appellant, in accordance with bureau regulations, "that he was represented by counsel, on that particular charge, and that I couldn't talk to him about it." According to Sergeant North when appellant was informed that Scott and North could not talk to him while he had an attorney, appellant responded "Well, I'll fire the son–of–a–bitch, he's nothing but a gump anyway." Scott testified that appellant used an expletive to indicate that he would fire his attorney. Appellant later denied referring to Anding as a "son–of–a–bitch" but admitted calling him a "gump." North and Scott left without asking appellant any questions at that time. Michael Scott returned to the office of Daniel Buescher, the Prosecuting Attorney of Franklin County, and asked for guidance on how to go about talking to the appellant.

The following morning, on September 26, 1978, Mr. Buescher called Harold Barrick, Chairman of the Advisory Committee of The Missouri Bar. Mr. Buescher told Mr. Barrick that he had appellant in custody, that appellant was represented by James Anding, that appellant wanted to talk with representatives of Mr. Buescher's office outside the presence of his attorney, and that appellant wanted to implicate his attorney in the crime with which appellant had been charged. Mr. Barrick discussed the question with the Advisory Committee, and telephoned Mr. Buescher and advised him that it was the opinion of the Advisory Committee that before he could talk to that defendant it would be necessary that appellant discharge his attorney.

On the same day, Michael Scott and Robert North went to the St. Clair County Jail in Belleville, Illinois, where appellant was being held on the federal charge, arriving at about 3:00 p. m. Edwin Kuster was also present. Michael Scott read appellant his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The three visitors informed appellant that, because appellant was represented by counsel, they could not talk to him or take his statement. Appellant replied, "Well, how about if I fired him?" The visitors answered "We cannot advise you to do that." Appellant stated that he wanted to make a statement and that he wanted to fire his attorney, James Anding. Appellant was then told that if he decided to fire his attorney, he would have to contact Mr. Anding. The captain in charge of the St. Clair County Jail arranged for appellant to telephone James Anding, but appellant

failed to contact Anding because the attorney was not in his office at the time. Appellant insisted that he be allowed to fire his attorney, and asked how it could be done. Michael Scott then supplied appellant with a form hand written on a sheet of notebook paper which purported to dismiss James L. Anding as appellant's attorney. Because appellant was illiterate, having only a third grade education, the document was read to him. The document said:

I, Richard W. Chandler, do hereby dismiss James L. Anding as my attorney in all pending cases and any and all future cases. I do not want Mr. Anding to represent me in anything.

Appellant signed the document, and Edwin Kuster signed it as witness. It was filed with the Circuit Court of Franklin County on September 29, 1978, three days later.

After appellant signed the document to dismiss his attorney, Michael Scott questioned appellant concerning the Langworthy killing. Appellant said that he had killed Langworthy, but did not describe the incident in detail at that time. Scott and the other visitors asked appellant if would be willing to have his statement concerning the killing videotaped, and appellant agreed. Scott, North and Kuster left the St. Clair County Jail on September 26, 1978, at about 4:30 p. m. and returned the following day. They brought with them videotaping equipment belonging to the Missouri State Highway Patrol. Before the taping began, Sergeant North read appellant his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked appellant whether he understood each of those rights. Appellant indicated that he understood his rights and wanted to make a statement. At the beginning of the videotaping, Michael Scott again advised appellant of his rights and obtained appellant's signature on a "WAIVER OF RIGHTS" form. The following exchange took place:

Scott: All right, Richard, it's my understanding that you neither read or write. Is that correct?

Chandler: Yes that is right. I don't read or write too well at all.

Scott: All right, Richard. What I'm going to do is read to you your rights. The rights which are granted to you under the Constitution of the United States. I want you to listen very, very carefully to each and every one of these rights. Do you understand?

Chandler: Yes sir.

Scott: All right, before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advise [sic] before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering any time until you've talked to a lawyer. Richard, do you understand the rights that I've just read to you?

Chandler: Yes I do very well.

Scott: You understand each and every one of those rights?

Chandler: Yes, I do.

Scott: Keeping those rights in mind, knowing these are rights granted to you as a citizen of the United States, under the Constitution, do you wish to waive your rights, that is give up your rights today and talk to us?

Chandler: Yes, I do.

Scott: All right, so what you're saying is the following. I'm going to read this paragraph to you and I'm going to use the first person as if it were you reading it but since you cannot, I'm going to read it as if you were. I have read this statement of my rights and I understand what may rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and

no pressure or coercion of any kind has been used against me. Do you understand that?

Chandler: Yes, I do.

Scott: This is basically what you are saying here today?

Chandler: Yes.

Scott: That is what you are saying?

Chandler: Yes, that is exactly what I am saying.

Scott: All right. Richard, can you sign your name?

Chandler: Yes, I can.

Scott: All right, this is the rights form that I read to you, is it not?

Chandler: Yes, it is.

Scott: You saw me read it. from this form?

Chandler: Yes.

Scott: All right, would you sign where the "X" is please?

Chandler: Yes.

Scott: Fully understanding that your signature shows that you are giving up your Constitutional Rights.

Chandler signs the waiver of rights form.

Scott: Sergeant North, would you sign also where it says "witness", please? That is the form that I read from, is it not?

North: Yes.

Sergeant North signs as a witness on the waiver of rights form.

Scott: Richard, I'm also placing my signature on this form directly underneath Sergeant North's.

Chief Investigator Scott signs as a witness on the waiver of rights form.

Scott: As you see, I'm going to place the time which is 1:43 p. m. directly under my signature. At the top, I'm going to put down the place, the St. Clair County Jail. I'm also going to put down the date.

North: Indicate on there Belleville, Illinois.

Scott: Yes. And the time we started was 1:36 p. m. Richard, do you have any questions at all about your rights?

Chandler: No.

Appellant then described the killing of Joseph Langworthy and being hired to do so by Attorney James Anding. Appellant stated that one afternoon in April of 1976, while appellant was riding in Anding's Chevrolet wagon, Anding "mentioned the fact that he would like to see Mr. Langworthy get killed." The statement proceeded as follows:

Chandler: And then I said that I do things for pay. In other words, I said I snuffed people out for money.

Scott: Okay.

Chandler: And he thought for approximately thirty minutes while we were on our journey and he said, "How much would you charge me to kill him?" referring to Langworthy and I said, "Well, I don't know." I said, "How much do you think it would be worth?" He said, "Well, you gotta have your own count how much you'd like to have." And I said, "Well, I usually don't do any asking under $10,000." He said, "Oh, man that's too much. I don't have that kind of money." I said, "Beings as you're a friend of mine and you do me a lot of favors and everything on law bits and things and help my family on law bits and things, I'll do it for you for $7,000. Half up front and the other half when it's done." He said, "Okay, it's a deal." And nothing more was said about it for about—approximately three weeks and I seen him and I was low on money and I said, "Hey, what about the money bit?" And he said, "I was getting some money together. I'll have it for you in a couple of days." So three days later he gave me $3,500 and in the meantime

. . . . .

And in the meantime. him and I had went to a ballgame so he could show me who the victim, Langworthy was because I did not know the man. I had never heard of him until then. And he took me to a ballgame and showed him to me and said he played some kind of

musical instrument at the ballgames for the Cardinals when the Cardinals played at home and it was in the evening so we went to the ballgame and the man wasn't there so a couple of days later I went to Court with him in Union, Missouri in Franklin County and he walked by where the man was sitting at a bench and laid his hand on the back of the bench and that's what he said he would do and that's how I knew who the guy was.

. . . . .

And then I followed him a few times after he left–went out of town and waited outside of town and followed him on home and they drove too fast and there was too much traffic on the road and I never could get a chance to shoot him because that's what I intended to do was to shoot him. And I never got a chance to do that so on August 2, [1976,] . . . .

. . . . .

So on that night I sat and watched the secretary leave from across the street and she got in her car approximately about 9:35–I would say it was close to 10:00 and she got in her car and left. About twenty minutes later I drove across the street and parked beside the building and went around on in the door and checked the door to see if it was unlocked and it was unlocked. I went on in the building and went up the steps and knocked on the door and hollered, "Is anyone here?" And then stepped on in, in the hallway and I seen Mr. Langworthy walk across the room and asked me what I wanted and I had a pistol, a 357 Magnum and I told him that I came to

Scott: Did you have the pistol out?

Chandler: Yes, I did.

Scott: Was it pointed at Mr. Langworthy?

Chandler: Yes, it was.

Scott: All right.

Chandler: And I told him, I said, "Sit in the chair by the desk and take all your money out and put it on the desk. Take all your money out of your billfold. I don't want to touch nothing, because I don't have no gloves. I don't want to leave no fingerprints in the building. So you take all the money out and put it on the desk." So he took the money out and put it on the desk which was about $250 and–As a matter of fact to be exact, it was $246.

Scott: All right.

Chandler: And I stuck that in my pocket and then I put the gun in the side of his head and pulled a knife out of my pocket with my left hand and he put his hand up around his face and I told him, "Take your hands down. I'm not going to hurt you. I'm going to show you something with this knife." And he wouldn't take his hands down so I stabbed him in the stomach and when his hands went down, then I cut his throat with a knife and took the gun and stuck it back in my boot and took a handkerchief from my pocket and wrapped the knife in it. At first I seen he was on the phone. I seen the phone off the hook and realized he was on the phone so I stepped over him and by that time he picked up the phone and was trying to talk but he couldn't–it was just a murmur. And I cut the phone wire and wrapped the knife in my handkerchief and stuck it back in my pocket, went down the steps, got in my car and left.

Scott: All right Richard, excuse me, from the time you knocked on the door and until the time you left, what if anything did Mr. Langworthy say to you?

Chandler: "Please don't kill me." I told him I wasn't there to kill him because I didn't want him to start screaming or creating any sound because I didn't want to shoot the guy because I didn't want to attract no attention. That was the full intention of having the knife because I didn't want to attract no attention. Because I knew the police would be around the town. And when they heard the shot there would be a lot of police and that would be bad so

North: Did he say anything else?

Chandler: Yes he said, "Please don't kill me" and then after I cut his throat he said, "Lord, don't let him kill me" and this and that.

Scott: After you cut his throat?

Chandler: Well, before I cut his throat and then after I cut his throat he was trying to talk saying something that sounded like he was asking the Lord for something but I didn't pay too much attention.

Scott: Let me ask you this, when you did this was he sitting or standing?

Chandler: Sitting. Sitting in the chair. I was standing on the front of him just like this microphone's in front of me. That's the way he was in front of me when I was standing with the guy laying on the shoulder at the side of his head.

Appellant described driving out of Pacific, Missouri, throwing the knife used into the river, and destroying the boots he wore the night of the killing by filling them with rocks and throwing them in a mud pond near his mother's house.[1] He maintained that he acted alone, that "I was by myself all the time." Appellant also stated that Anding paid him the second $3,500 six or seven days after the murder. He concluded by saying that he gave the statement completely voluntarily, and that "[n]o one threatened me with anything or promised me nothing."

Nine days later, on October 6, 1978, appellant testified before the Grand Jury for the September Term, 1978, of the County of Franklin, and related a similar account of the killing of Joseph Langworthy. At the beginning of appellant's grand jury testimony prosecuting attorney Daniel Buescher informed appellant of his rights under the fifth and sixth amendments and appellant stated that he fully understood his rights and wanted to testify before the grand jury. Portions of the transcript of appellant's grand jury testimony were read to the jury in his trial for capital murder. Appellant testified before the grand jury that he acted alone the evening of August 2, 1976; that he robbed Langworthy at gunpoint before killing him; that he "stabbed him in the stomach and twisted the knife" so that Langworthy would put his hands down "and then I slashed his throat;" that James Anding agreed to and did pay him $7,000 for killing Langworthy, $3,500 before the killing and $3,500 five to eight days later; that Anding pointed Langworthy out to him in a courtroom in Union, Missouri; that the night of the killing appellant threw the knife used in the killing into the Meramec River; and that he filled the boots he wore with rocks and threw them in a pond near his mother's house.

On September 29, 1978, the federal charges against appellant were dismissed by United States Attorney Michael Reap because of appellant's cooperation in the ongoing state investigation.

On October 13, 1978, a second document discharging appellant's attorney was typed, signed, and filed with the Franklin County Magistrate Court. On October 17, 1978, appellant appeared before the Franklin County Magistrate Court and informed the court that neither James Anding nor Daniel O'Brien represented him.[2] The court ap-

1. Michael Scott later recovered a pair of boots filled with rocks from a pond near appellant's mother's house. The boots were introduced into evidence.

2. Appellant contends that he was also represented by Daniel O'Brien before he was taken to St. Louis on the federal charge. He claims that he only discharged Anding and was still represented by O'Brien at the time of the interrogations. On the docket sheet for August 17, 1978, in the Franklin County Magistrate Court, the names of both O'Brien and Anding are listed as attorneys of record. However, O'Brien's signature was not on the docket sheet and O'Brien testified in the October 17, 1978 proceedings that he had never met appellant. On June 19, 1979, appellant testified at the hearing on his motion to dismiss the indictment that he had not met O'Brien until after he returned from Belleville, Illinois. Appellant testified at trial that he had never talked to O'Brien about his case. Even if O'Brien had been appellant's attorney at the time appellant made the videotaped statement and testified before the grand jury, the question whether appellant's statements were admissible remains

pointed Franklin County public defender Melvin G. Franke as appellant's counsel and he, among other reasons, asked to be relieved because of his fears arising out of rumors of threats made against the investigator and others. The public defender was dismissed that same afternoon and two days later Michael A. Gross was appointed to represent appellant on the murder charge.[3] On October 25, 1978, attorney Gross filed a motion to suppress the statements appellant had made on videotape and before the grand jury.

On January 19, 1979, Hale Brown entered the case as counsel for appellant and filed a motion for change of venue. That motion was granted on January 23, 1979, and the cause was moved from Franklin County to Greene County, Missouri.

On March 23, 1979, attorney Brown filed a motion in the Circuit Court of Greene County to suppress appellant's confessions. The court treated the March 23 motion to suppress as supplementary to that filed on October 25, 1978, and held a hearing on both motions on March 23, 1979. At the hearing, Michael Scott testified that appellant had made no inculpatory statements prior to the videotaped confession on September 27, 1978. Scott testified that he did not advise appellant to fire his attorney Anding, but rather that appellant would have to talk with Anding before any statements could be taken. Scott admitted that the federal charges were dismissed to get appellant to testify against Anding but stated that he played no part in that federal decision. Scott further testified that he had made no promises to appellant and had told appellant that it was up to the court to reduce his bond or dismiss the charge filed against him; that the prosecuting attorney would oppose such a move; and that appellant would have to take to Prosecuting Attorney Buescher his request to have his term of punishment reduced if he confessed. Agent Kuster testified that he had denied

appellant's request for a deal because of bureau regulations prohibiting him from discussing the crimes with appellant in the processing procedure. Kuster further testified that he had never told appellant that he could have the federal charges dismissed, but only that he would refer the request to United States Attorney Michael Reap. Sergeant North testified that the federal charges were not dismissed as a result of any promise made to appellant. Appellant presented no evidence at the March 23, 1979, hearing on his motion to suppress his inculpatory statements. On April 30, 1979, the trial court overruled appellant's motion.

On June 7, 1979, appellant filed a motion to dismiss the indictment with prejudice, or in the alternative, to suppress all confessions, statements, grand jury testimony, and all speaking and writing attributable to appellant, on the ground that such statements resulted from violations of appellant's sixth amendment right to counsel. On the same day, respondent filed a motion in limine to exclude testimony concerning Joseph Langworthy's character, alleging that such character evidence was irrelevant, immaterial and prejudicial because appellant had not alleged that he acted in self–defense.

On June 19, 1979, an evidentiary hearing was held on appellant's motion to dismiss and respondent's motion in limine. At the hearing, appellant testified that he knew of his right to remain silent and his right to counsel and that he knowingly waived those rights before giving his videotaped statement and grand jury testimony, but that all of his inculpatory statements were lies. Specifically, appellant maintained that when he earlier stated that his confession was not induced by promises, he had lied. Appellant testified that his confession was induced by numerous promises made to him, especially by Michael Scott. Appellant testified that Scott had promised him that his bond would be set so that he could secure

whether or not appellant effectively relinquished his right to the presence of counsel before making these statements.

3. Michael Gross had been appointed to represent appellant on the federal firearms charge that was dismissed after appellant's videotaped statement was taken.

his release, that his brothers Michael and Darrell would not be prosecuted, that appellant would not receive a life sentence which was not parolable for fifty years but that the prosecutor would seek only a twenty year sentence, and, that a friend of Scott's who worked as a reporter for the Washington Post would write a book about appellant's life from which appellant would earn a lot of money. On cross–examination, appellant admitted that Michael Scott had not made promises, but only told appellant "what he could do, and what he couldn't do." Michael Scott, Robert North, and Edwin Kuster each testified at the March 23, 1979, hearing and at trial, and Michael Scott testified at the June 19, 1979, hearing that they had made no promises to appellant, and that no promises were made to the appellant in their presence, as inducement for his inculpatory statements. On June 25, 1979, the trial court overruled appellant's motion to dismiss and sustained respondent's motion in limine relating to evidence of the victim's character.

Substantial evidence of appellant's guilt other than his videotaped statement and grand jury testimony was introduced at his trial. Mrs. Helen Brauer testified that about an hour before the murder, three men had come into Langworthy's office to discuss a divorce, but she was unable to recognize any of the men. Gary Foree, one of Langworthy's clients, testified that he and his ex–wife were in the waiting room outside Langworthy's office the evening of August 2, 1976, when three men visited with Langworthy in his office, but he could not identify appellant as one of the three men.

Michael Chandler testified that in June of 1976 his brother, appellant Richard Chandler, offered him two to three hundred dollars if Michael would stand watch while appellant murdered a man. Michael testified that he agreed to stand lookout because he needed money to support a drug habit which cost him some fifty to ninety dollars per day. Michael testified that in the evening of August 2, 1976, he and his brothers Richard and Darrell drove from Potosi, Missouri, to Pacific, Missouri, in ap-

pellant's blue Pontiac LeMans convertible. The three men went to Joseph Langworthy's office on the pretext of seeking Langworhty's help in obtaining a divorce for Darrell. They observed a young man and young woman with Langworthy's secretary in the outer office. Michael and his brothers talked with Mr. Langworthy for a while and then left the office. They waited outside the office until Langworthy's clients and secretary had left. Michael stood near the stairwell outside Langworthy's office while his brothers entered the office. Richard was carrying a knife and Darrell was carrying a revolver. Michael heard Langworthy beg for his life and then heard "some gurgling noises." Michael testified that when Richard and Darrell came out of the office, he saw blood on appellant's right hand. The three men returned to appellant's car and drove back to Potosi, Missouri. Once in the car, Michael saw appellant wrap the knife in a rag and place it beside the driver's seat. The next day, appellant paid Michael two hundred dollars for his help. About a week later, appellant gave Michael the boots appellant was wearing the night of the murder. Michael testified that he filled the boots with rocks and threw them into a pond near his mother's house.

Michael testified that he "more or less" blurted out his confession to interrogators in Lonoke, Arkansas, in June of 1978, because he could not live with it any longer. He stated that the federal government had dismissed burglary charges against him in Lonoke, Arkansas, and Washington County, Missouri, in exchange for his testimony against appellant.

Charles E. Carroll, a twenty–two year old acquaintance of Michael Chandler and his brothers, testified that appellant had approached him "a month or two" before the murder and asked him if he wanted to kill a man for six hundred dollars. Carroll refused the offer. Carroll testified that after the murder appellant told him that appellant and his brothers Michael and Darrell had been involved in the Langworthy murder. Carroll testified that appellant told

him that appellant himself had killed Langworthy and paid Michael and Darrell two hundred dollars each for their help. Carroll first related these events to federal agent Edwin Kuster in the summer of 1978, after his arrest on a charge of possession of an unregistered firearm, for which he was serving time at the time of this trial. He stated that no charges were dismissed in exchange for his testimony at appellant's trial.

Evidence of a statement made by appellant on October 17, 1978, before Judge Lawrence O. Davis in the Circuit Court of Franklin County was also read to the jury. Appellant told the court

> What I would like to do is to just–see, I don't really care about a bond hearing or anything else. All I want to do is just go ahead and plead guilty, get it over with, because my brother [Darrell Chandler] is laying up here in this jail for no reason whatsoever. And I would just like to see you set a bond on him or turn him lose or something and let him out. Because I'm the guilty party, not him because he didn't have nothing to do with it. That's it.

Appellant testified in rebuttal that when he said "I'm the guilty party," he did not mean that he was guilty of murder, but meant only that he was the one who was guilty of making a false confession, "the guilty party of the lying that had been told."

Appellant testified that his confession in the videotaped statement taken September 27, 1978, and his testimony before the Franklin County Grand Jury on October 6, 1978, was completely false, and that he and Michael Scott had fabricated the story. Appellant testified that his statements had been induced by promises that Michael Scott had made to him to reduce his bond, to recommend a shorter sentence, to free his brothers, and to have a person who could write his biography visit him. Appellant testified that in 1975 he had purchased three pairs of boots, one for his son, one for his brother Michael, and one for himself. Appellant testified that Michael later told appellant that he had gotten into trouble,

that he might have gotten blood on the boots and that he had to get rid of them. Appellant testified that Michael said he had filled the boots with rocks and thrown them into the pond at their mother's house. Darrell Chandler testified concerning an incident in the fall of 1976 in which he struck his brother Michael and ordered him to stay away from Darrell and his family. Darrell testified that since that time neither Darrell nor his family had associated with Michael.

In rebuttal, the state called Michael Scott and Ilene Ray. Michael Scott testified that he had not told appellant the facts of the Langworthy murder before appellant made the videotaped statement or at any other time; that he did not tell appellant he would obtain several million dollars for a book on appellant's life; and that he had not told appellant any of the facts learned from Michael Chandler in Lonoke, Arkansas, before appellant gave his statement on videotape or testified before the grand jury. Ilene Ray testified that she was a sister of Darrell Chandler, Michael Chandler and appellant. She testified that in July or August of 1976, Darrell did beat up Michael, but that since that time Darrell and Michael had associated, had gone hunting together, and Michael had spent the night at Darrell's house several times.

The jury found appellant Richard Chandler guilty of capital murder on June 28, 1979. On July 11, 1979, appellant filed a motion for a new trial. On the same day, the trial court overruled appellant's motion for new trial and sentenced him to life imprisonment without eligibility for probation or parole for fifty years. On July 18, 1979, appellant filed notice of appeal to this Court, alleging that jurisdiction was in this Court because the appeal involved the construction of the federal or state Constitutions.

I

█ There is no contention on the part of appellant that failure of the prosecuting attorney to give notice to appellant's attorney before his special investigator Michael Scott communicated with appellant on the subject of the pending murder charge con-

stituted an ethical violation of Disciplinary Rule 7–104(A)(1)[4] or that such a violation might constitute a ground independent of the sixth amendment for exclusion of the evidence in question. *See State v. White,* 494 S.W.2d 687, 692 (Mo.App.1973). *Cf. State v. Witt,* 422 S.W.2d 304, 309 (Mo. 1967). While we are not required to meet this issue and further discussion of this point is unnecessary, we feel obligated to suggest that only the unique circumstances of this case could keep such actions from being extremely suspect and this case should not be read as an expression of this Court's approval of communication with defendants without notice to their counsel. Inability to find any other reported case where a defendant sought to discharge his counsel for the alleged reason that he had been employed by his counsel to commit murder is indicative of the truly unique situation in which this prosecuting attorney found himself.

## II

Appellant contends that Scott's ongoing discussions with appellant without the knowledge of appellant's counsel and Scott's involvement in firing appellant's counsel constituted such an interference with appellant's right to counsel as guaranteed by the sixth amendment as to require exclusion of appellant's inculpatory statements. The central question presented is whether appellant waived his right to the assistance of counsel at the time he made his videotaped statement and testified before the grand jury.

In resolving the sixth amendment question, we look for guidance to the opinions of the United States Supreme Court. The Court first applied the sixth amendment to post–indictment communications between the accused and agents of the government in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *See United States v. Henry,* —— U.S. ——, ——, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980). In *Massiah,* the petitioner was convicted of possession of narcotics aboard a United States vessel. While Massiah was under indictment and free on bail, his code-

---

**4.** In Rule 4, Missouri's Code of Professional Responsibility, Disciplinary Rule 7–104(A)(1) provides:

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Ethical Consideration 7–18 provides:

The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel. For this reason a lawyer should not communicate on the subject matter of the representation of his client with a person he knows to be represented in the matter by a lawyer, unless pursuant to law or rule of court or unless he has the consent of the lawyer for that person. If one is not represented by counsel, a lawyer representing another may have to deal directly with the unrepresented person; in such an instance, a lawyer should not undertake to give advice to the person who is attempting to represent himself, except that he may advise him to obtain a lawyer.

Attorneys have been disciplined for violating this ethical requirement. *In Re Atwell,* 232 Mo.App. 186, 115 S.W.2d 527 (1938) (violation of Canon 9 of the Canons of Ethics). A number of recent cases in other jurisdictions appear to have condemned the practice of interrogating an accused who is represented by counsel without notifying his attorney. *United States v. Woods,* 544 F.2d 242, 255 (6th Cir. 1976), *cert. denied sub nom., Woods v. United States,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *United States v. Thomas,* 474 F.2d 110, 111–12 (10th Cir.), *cert. denied sub nom., Thomas v. United States,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *United States v. Four Star,* 428 F.2d 1406, 1407 (9th Cir.), *cert. denied sub nom., Four Star v. United States,* 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970); *Wilson v. United States,* 398 F.2d 331, 333 (5th Cir. 1968), *cert. denied,* 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969); *Coughlan v. United States,* 391 F.2d 371, 372 (9th Cir.), *cert. denied sub nom., Coghlan v. United States,* 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *Shreeves v. United States,* 395 A.2d 774, 782 (D.C.App.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Boykins v. United States,* 366 A.2d 133, 135 (D.C.App.1976); *State v. Hull,* Minn., 269 N.W.2d 905, 909 (1978); *State v. Fossen,* 312 Minn. 414, 255 N.W.2d 357, 362 (1977); *State v. Renfrew,* 280 Minn. 276, 280, 159 N.W.2d 111, 113 (1968).

fendant Colson permitted a government agent to install a radio transmitter in Colson's automobile and the agent overheard Massiah make several incriminating statements in a conversation with Colson. The agent testified at Massiah's trial concerning these incriminating statements. The United States Supreme Court held that Massiah's sixth amendment rights were violated "when there was used against him at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203. The Court agreed with the dissenting judge in the court of appeals, that the sixth amendment applies "to indirect and surreptitious interrogations as well as those conducted in the jailhouse" and that Massiah's rights were more seriously imposed upon because he did not know he was being interrogated by a government agent. *Id.*; 307 F.2d 62, 72–73. There were no circumstances in *Massiah* to indicate that the accused had intentionally and knowingly relinquished his right to counsel.[5]

In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), respondent Williams was convicted of murdering Pamela Powers, a ten year old girl who had been abducted from the Des Moines, Iowa, YMCA on Christmas Eve in 1968. Williams was seen leaving the YMCA premises that evening with a large bundle wrapped in a blanket. On December 26, 1968, Williams telephoned his Des Moines attorney from Davenport, Iowa, and his attorney advised him to turn himself in to the Davenport police. Two Des Moines policemen drove the 160 miles to Davenport to pick up Williams and return him to Des Moines, after Williams' attorney told him not to talk to the policemen about the abducted girl and the policemen agreed not to question him during the trip. In Davenport, another attorney representing Williams instructed him not to discuss Pamela Powers with police until after he saw his Des Moines attorney, and instructed the police not to interrogate him during the trip. "At no time during the trip did Williams express a willingness to be interrogated in the absence of an attorney." 430 U.S. at 392, 97 S.Ct. at 1236. During the trip, Detective Leaming, who knew that Williams was a former mental patient and knew that he was deeply religious, delivered the so-called "Christian burial speech," in which he described the worsening weather conditions and the likelihood of snow, observed that only Williams knew the location of the girl's body and even he might be unable to find it with snow covering it, expressed certainty that they would be going past the area where the body was located as they drove to Des Moines, and suggested that the parents of the girl were "entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered." 430 U.S. at 392–393, 97 S.Ct. at 1236. Detective Leaming told Williams the reason he thought their route would pass the girl's body was that he knew the body was near Mitchellville. Leaming told Williams he did not want Williams to answer him, but just to think about it during their journey. As the car approached Mitchellville, Williams said he would show the officers where the girl's body was, and directed them to it.

5. Mr. Justice White, joined in dissent by Justices Clark and Harlan, stated:

This case cannot be analogized to the American Bar Association's rule forbidding an attorney to talk to the opposing party litigant outside the presence of his counsel. Aside from the fact that the Association's canons are not of constitutional dimensions, the specific canon argued is inapposite because it deals with the conduct of lawyers and not with the conduct of investigators. Lawyers are forbidden to interview the opposing party because of the supposed imbalance of legal skill and acumen between the lawyer and the party litigant; the reason for the rule does not apply to nonlawyers and certainly not to Colson, Massiah's codefendant.

Disciplinary Rule 7–104(A)(1) of the Code of Professional Responsibility differs from Canon 9 of the Canons of Ethics in that the disciplinary rule not only prohibits a lawyer from communicating on the subject of representation with a party who is known to be represented by a lawyer in the matter but also prohibits the lawyer from "caus[ing] another to communicate" with such a person.

After a hearing on a pretrial motion to suppress evidence resulting from statements Williams made during the automobile ride, the Iowa trial court found that Williams had waived his right to have an attorney present during the giving of such information. The Iowa Supreme Court affirmed the conviction. The United States District Court for the Southern District of Iowa granted Williams' petition for a writ of habeas corpus, holding that Williams had been deprived of his sixth amendment right to counsel, and the Eighth Circuit Court of Appeals and the United States Supreme Court affirmed.

The Court found that although Detective Leaming was fully aware that Williams was represented by counsel in two cities, "he purposely sought during Williams' isolation from his lawyers to obtain as much incriminating information as possible." 430 U.S. at 399, 97 S.Ct. at 1240. Finding that Leaming's "Christian burial speech" was tantamount to interrogation, the Court found the circumstances of the case constitutionally indistinguishable from ' those presented in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). 430 U.S. at 400, 97 S.Ct. at 1240. Because there was an interrogation that took place after adversary proceedings had begun, Williams had the right to the assistance of counsel. The Court addressed in a separate subsection of the opinion the government's contention that Williams had waived his sixth amendment rights. 430 U.S. at 401–06, 97 S.Ct. at 1240–43. The Court held that the question of waiver is not merely a question of historical fact but is a question which requires application of constitutional principles to the facts; that the state must bear the burden of proving "an intentional relinquishment or abandonment of a known right or privilege" and courts indulge every reasonable presumption against waiver; and that the record did not support a finding that the state had sustained its burden of proof. 430 U.S. at 403–04, 97 S.Ct. at 1242. The Court emphasized Williams' "consistent reliance upon the advice of counsel in dealing with the authorities," *id.* at 404, 97 S.Ct. at 1242, and

observed that when Detective Leaming undertook to elicit incriminating statements from Williams, "Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no effort at all to ascertain whether Williams wished to relinquish that right," *id.* at 405, 97 S.Ct. at 1243. The Court stated:

> The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not.

430 U.S. at 405–06, 97 S.Ct. at 1243. (Emphasis in original.) In a concurring opinion, Mr. Justice Powell wrote:

> The dissenting opinion of THE CHIEF JUSTICE states that the Court's holding today "conclusively presumes a suspect is legally incompetent to change his mind and tell the truth until an attorney is present." *Post* at 1249. I find no justification for this view. On the contrary, the opinion of the Court is explicitly clear that the right to assistance of counsel may be waived, after it has attached, without notice to or consultation with counsel. *Ante* at 405–06.

430 U.S. at 413, 97 S.Ct. at 1246. *Brewer* has been interpreted to support the view that a defendant may waive his right to counsel without consulting his attorney. *United States v. Rodriguez–Gastelum*, 569 F.2d 482, 488 (9th Cir.) (en banc), *cert. denied sub nom., Rodriguez–Gastelum v. United States*, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978); *Stringer v. State*, 372 So.2d 378, 382–83 (Ala.Cr.App.); *Shreeves v. United States*, 395 A.2d 774, 781 (D.C.App.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Watson v. State*, 282 Md. 73, 382 A.2d 574, 579–80, *cert. denied sub nom., Watson v. Maryland*, 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140 (1978); *People v. Green*, 405 Mich. 273, 274 N.W.2d 448, 455 (1979); *State v. Atteberry*, 39 Or.App. 141, 591 P.2d 409, 411 (1979); *State v. Cline*, 405 A.2d 1192, 1199–1200 (R.I.1979). *See United*

*States v. Brown*, 569 F.2d 236, 239 (5th Cir. 1978) (en banc).[6]

In *United States v. Henry*, —— U.S. ——, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), respondent Henry was convicted of armed bank robbery. Pending trial, Henry was held at the City Jail of Norfolk, Virginia, and for a time shared a cell with another inmate named Nichols. Nichols was a paid informant for the FBI, who had been instructed not to initiate any conversations with Henry, or to question him about the charges against him, but to pay attention to Henry's statements if Henry engaged Nichols in conversation or talked in front of him. At trial, Nichols testified that Henry told him he had committed the robbery, and described the robbery in detail, in conversations in Norfolk City Jail. The United States Supreme Court held that Nichols' testimony concerning Henry's inculpatory statements should have been excluded as a violation of Henry's sixth amendment right to counsel. The Court found that the government had "deliberately elicited" the incriminating information, by using an agent who was paid a "contingent fee" for information and who posed as a fellow inmate who could engage Henry in conversation without arousing Henry's suspicion. The Court held that there was no question of waiver of sixth amendment rights involved in the case: "the concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the government." —— U.S. at ——, 100 S.Ct. at 2188. The Court stated that the government in Henry's case had "planned an impermissible interference with the right to the assistance of counsel," citing Disciplinary Rule 7–104(A)(1) of the Code of Professional Responsibility.[7]

■ We find appellant in the case at bar did "knowingly, intentionally, and voluntarily relinquish his right" to the assistance of

**6.** Prior to *Brewer*, several decisions of the circuit courts of appeal upheld against a sixth amendment challenge convictions obtained through the use of incriminating statements made by an accused who was represented by an attorney but interrogated in the absence of his or her attorney. *United States v. Reynolds*, 496 F.2d 158, 162 (6th Cir. 1974); *Moore v. Wolff*, 495 F.2d 35, 37 (8th Cir. 1974); *United States v. Dority*, 487 F.2d 846, 848 (6th Cir. 1973); *United States v. Cobbs*, 481 F.2d 196, 200 (3d Cir.), *cert. denied sub nom. Cobbs v. United States*, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); *United States v. Thomas*, 474 F.2d 110, 112 (10th Cir.), *cert. denied sub nom., Thomas v. United States*, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973); *United States v. Springer*, 460 F.2d 1344, 1350–52 (7th Cir.), *cert. denied sub nom., Springer v. United States*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972); *United States v. Crisp*, 435 F.2d 354, 359 (7th Cir. 1970), *cert. denied sub nom., Crisp v. United States*, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); *United States v. Four Star*, 428 F.2d 1406, 1407 (9th Cir.), *cert. denied sub nom., Four Star v. United States*, 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253 (1970); *Wilson v. United States*, 398 F.2d 331, 333 (5th Cir. 1968); *cert. denied*, 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969); *Coughlan v. United States*, 391 F.2d 371, 372 (9th Cir.), *cert. denied sub nom., Coghlan v. United States*, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); *United States v. Smith*, 379 F.2d 628, 633 (7th Cir.), *cert. denied sub nom., Smith v. United States*, 389 U.S. 993, 88 S.Ct. 491, 19 L.Ed.2d 486 (1967). *See also United States v. Crook*, 502 F.2d 1378, 1380–81 (3d Cir. 1974), *cert. denied sub nom., Crook v. United States*, 419 U.S. 1123, 95 S.Ct. 808, 42 L.Ed.2d 823 (1975); *United States v. Durham*, 475 F.2d 208, 211 (7th Cir. 1973). *Contra, Hancock v. White*, 378 F.2d 479, 482 (1st Cir. 1967); *United States ex rel. O'Connor v. New Jersey*, 405 F.2d 632, 636 (3d Cir.), *cert. denied sub nom., Yeager v. O'Connor*, 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969).

**7.** The Court apparently believed that the government's action in *Henry* constituted not only a violation of the sixth amendment right to the assistance of counsel but also a violation of minimal ethical standards. The Court indicated, however, that the disciplinary rule "does not bear on the constitutional question in this case." —— U.S. at ——, n.14, 100 S.Ct. at 2189 n.14. Compare *State v. McConnell*, 529 S.W.2d 185, 189 (Mo.App.1975) (where an effective waiver of the right to assistance of counsel is shown "the Code of Professional Responsibility has no role in the admissibility of statements") with *State v. White*, 494 S.W.2d 682, 692 (Mo. App.1973) (Former Canon 9 of the Canons of Ethics "does place a responsibility upon prosecuting attorneys not to sanction, or take advantage of statements obtained from . . . a person represented by counsel, in the absence of counsel.")

counsel before making his videotaped statement on September 27, 1978, and testifying before the grand jury on October 6, 1978. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Unlike Williams, appellant Chandler did express a willingness to be interrogated in the absence of his attorney. Appellant was willing to dismiss his attorney to make it possible to give a statement and testimony implicating his attorney in the crime with which appellant was charged. Unlike Williams, appellant did not consistently rely on the advice of counsel in dealing with the authorities, but repeatedly and on his own initiative arranged to have conversations with the prosecutor's chief investigator. Unlike Detective Leaming, Chief Investigator Michael Scott did preface his efforts to elicit incriminating statements from appellant Chandler by telling him that he had the right to the presence of an attorney, and took pains to ascertain that appellant wished to relinquish that right. Unlike Henry and Massiah, appellant was unquestionably aware that he was dealing with agents acting for the government.[8] In view of appellant's repeated oral and written expressions of willingness to make statements in the absence of his retained counsel, especially in view of the fact that appellant expressed such willingness after being informed of his right to the assistance of counsel immediately prior to giving both of the statements sought to be excluded, we cannot find that appellant did not waive his right to the assistance of counsel at the time he made his videotaped statement and testified before the grand jury.

Appellant rests his argument that the videotaped statement and grand jury testimony were inadmissible because taken in violation of his sixth amendment right to counsel on *United States v. Levy,* 577 F.2d 200 (3d Cir. 1978) and *Gallarelli v. United States,* 441 F.2d 1402 (3d Cir. 1971).

In *United States v. Levy,* 577 F.2d 200 (3d Cir. 1978), appellant Donald Verna was convicted of conspiracy to distribute heroin. Verna was represented at trial by attorney Herbert S. Siegal, who also represented Verna's nephew and alleged co-conspirator, Nicholas Visceglia. After Verna and Visceglia were indicted, Visceglia agreed to become an informer for the federal Drug Enforcement Administration. Before Verna's trial began, Siegal learned of Visceglia's informant status, and withdrew from representation of Visceglia in the federal prosecution, but continued to represent Visceglia in a New York State prosecution involving the same transactions. Perhaps because his prior representation of Visceglia would have hampered his in court examination of Visceglia as a defense witness, Siegal chose not to present any witnesses for the defendant. The record unequivocally established that, because of Visceglia's participation in discussions between Verna and his attorney, the prosecutor learned that Verna's trial strategy would be to undermine the credibility of two key government witnesses. 577 F.2d at 205. In a pretrial hearing on a defense motion to dismiss, the district court used an "actual prejudice test" and refused to declare a mistrial or dismiss the indictment. The court of ap-

---

8. At the beginning of the videotaped interview, the following colloquy took place:

Scott: All right, present here today is myself. I've made myself–identified himself to you as Michael J. Scott.

Chandler: Yes.

Scott: Chief Investigator for the Franklin County Prosecuting Attorney.

Chandler: Yes.

Scott: Seated on your left is a man who has made himself known and has identified himself to you as Sergeant Robert A. North of the Intelligence Division of the Missouri State Highway Patrol. Is that correct?

Chandler: Yes.

Scott: The gentleman sitting there behind the camera has made himself known and has identified himself to you as Edward A. Kuster.

Chandler: Yes.

Scott: Of the U.S. Treasury Department, Division of Alcohol, Tobacco, and Firearms?

Chandler: Yes, he has.

Scott: Is that correct?

Chandler: Yes.

peals reversed, holding that where defense strategy actually has been disclosed and has become public information, the interference with the accused's sixth amendment right to counsel requires reversal of the conviction and dismissal of the indictment. The court of appeals also held that forcing Verna to trial represented by an attorney whose obligation to a potential witness may have conflicted with the attorney's duty of undivided loyalty to Verna violated Verna's sixth amendment right to effective assistance of counsel. The court stated, that, since Verna was not informed of his attorney's potential conflicts, it was not satisfied "that there has been a knowing and intelligent waiver of the right to the effective assistance of an attorney who is singly devoted to the defendant." 577 F.2d at 211. The court clearly recognized that a criminal defendant could effectively waive his sixth amendment rights, if the waiver is knowing and intelligent. Unlike *Levy*, there is no suggestion in the record of the case at bar that appellant's trial strategy was known to the government or that appellant's attorney at trial violated his duty of undivided loyalty.

In *Gallarelli v. United States*, 441 F.2d 1402 (3d Cir. 1971), appellant pleaded guilty to conspiracy to reproduce, transfer and possess counterfeit federal reserve notes. Appellant filed a motion to vacate sentence under 28 U.S.C. § 2255, alleging that he was not represented by counsel at a critical stage of the proceedings, and that his conviction violated his sixth amendment rights. The district court denied the motion without a hearing. The Third Circuit Court of Appeals reversed, and remanded the case to permit appellant to change his plea if he so desired after consultation with counsel. 441 F.2d at 1405. Gallarelli appeared in court with his codefendants without counsel when the codefendants all were represented by counsel. Gallarelli's attorney was from another state and could not appear, and sought leave of court to withdraw as Gallarelli's counsel. The court recessed to permit Gallarelli to decide whether to request the appointment of new counsel and to permit all the defendants to decide whether to

change their pleas. During the recess, Gallarelli was urged to plead guilty by his codefendants because the prosecutor would not accept a plea bargain unless all the codefendants pleaded guilty to one charge. After the recess, an attorney who represented one of Gallarelli's codefendants was appointed to represent Gallarelli. Before Gallarelli could confer with his new attorney, his plea of not guilty was withdrawn and his plea of guilty was accepted. The court of appeals stated that during the recess and plea–bargaining, Gallarelli's prospective new counsel was "properly silent, at the time when counseling normally would have occurred." 441 F.2d at 1405. The court reversed Gallarelli's conviction because "[t]he defendant did not in any meaningful sense have the benefit of counsel at the critical stage of his pleading to the indictment." *Id.* The court in *Gallarelli* was not presented with a criminal defendant who had voluntarily waived a known right to the assistance of counsel. On the contrary, Gallarelli clearly desired to be represented by counsel for his plea, as evidenced by his acceptance of the appointment of his codefendant's attorney to represent him. There is no indication that Gallarelli was given the opportunity to have the assistance of counsel in the plea–bargaining session during the recess but voluntarily and knowingly waived that right.

It is clear that *Levy* and *Gallarelli* do not provide authority for excluding from evidence appellant's videotaped statement and grand jury testimony in the instant case. Appellant was advised that he had the right to counsel and the right to a court–appointed attorney if he could not afford to hire one, on at least five occasions, including immediately prior to giving the videotaped statement and grand jury testimony sought to be excluded. On each occasion, appellant indicated that he understood his rights and voluntarily waived his right to the presence of counsel at the time he made incriminating statements.

### III

■ We recognize that a confession is not admissible if it was extracted by prom-

ises, direct or implied, however slight. *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *State v. Hughes*, 596 S.W.2d 723, 727 (Mo.banc 1980). There was conflicting testimony concerning whether appellant's statements were induced by promises, both in the pretrial hearing on appellant's motion to dismiss and at trial. The jury was instructed to disregard evidence that appellant had made statements relating to the murder unless they found that the statements were made freely and voluntarily. *See* MAI–Cr 3.44. Any dispute in the evidence on the question of whether appellant's statements were elicited by promises was for the trial court to resolve, and its determination should be affirmed if it was supported by substantial evidence. We find that there is sufficient evidence in the record to support the trial court's initial finding that appellant knowingly, intelligently, and voluntarily waived his right to the presence of counsel at the time he gave his videotaped statement and grand jury testimony. The record also supports the finding that his statements were not made in reliance on promises. The evidence was sufficient to support a jury finding that appellant made the statements freely and voluntarily under all the circumstances.

We find that the trial court did not err in admitting appellant's inculpatory statements into evidence, and we affirm the judgment of the trial court.

All concur.